PEOPLE v NASH

Docket No. 68280. Argued May 4, 1983 (Calendar No. 9).—Decided
December 19, 1983.

Carron L. Nash was convicted by a jury in the Gladwin Circuit
Court, Robert H. Campbell, J., of second-degree murder. The
Court of Appeals, R. B. Burns, P.J., and MacKenzie, J. (Kall-
man, J., concurring in part and dissenting in part), reversed
and remanded the case for a new trial, holding that evidence of
the victim's body should have been suppressed because it was
discovered during an unconstitutional search and that certain
evidence seized in the office of defense counsel was admissible
but that the place where it was found should not have been
disclosed to the jury (Docket No. 78-5505). The people appeal.

In separate opinions by Justices Brickley, Boyle, Ryan, Cav-
anagh, and Kavanagh, the Supreme Court *held:*

The search and seizure without a warrant of a box contain-
ing the body of the victim did not violate the defendant's state
or federal constitutional rights. Evidence of the body and
bullets recovered from it was admissible at trial. However,
admission of evidence that the source of certain items of
incriminating evidence which were independently linked to the
defendant was the office of defense counsel violated the defen-
dant's attorney-client privilege, and there must be a new trial.

Justice Brickley stated that evidence of the body of the
victim and the bullets recovered from it was admissible at trial.
In the totality of the circumstances, there was no search within
the meaning of the Fourth Amendment, because whatever
expectation of privacy the defendant had in the box containing

REFERENCES FOR POINTS IN HEADNOTES

[1-3, 7, 8] 29 Am Jur 2d, Evidence § 418.

68 Am Jur 2d, Searches and Seizures § 20.

[2] 68 Am Jur 2d, Searches and Seizures §§ 2, 4, 16.

[3] 68 Am Jur 2d, Searches and Seizures §§ 2, 6, 42 *et seq.*

[4-6] 68 Am Jur 2d, Searches and Seizures § 49.

81 Am Jur 2d, Witnesses § 222.

[5] Attorney-client privilege as affected by its assertion as to commu-
nications, or transmission of evidence, relating to crime already
committed. 16 ALR3d 1029.

the victim's body while it was in her trailer was defeated and was no longer objectively reasonable or legitimate under federal law once the box was moved outside the trailer by the action of a private person. The state constitution does not require application of a standard of reasonableness higher than that imposed by the Fourth Amendment to the examination of the box outside the defendant's dwelling. Testimony that certain evidence was seized at the office of defense counsel was proper.

1. Generally, the Fourth Amendment provides that a search without a warrant is unreasonable per se. However, not all intrusions by the government are searches within the meaning of the Fourth Amendment. The Fourth Amendment protects persons, not places. Fourth Amendment interests are intruded upon where governmental activity infringes on a justifiable or reasonable expectation of privacy. Whether such an expectation of privacy exists in both the subjective and objective sense is determined by scrutinizing the totality of circumstances surrounding the intrusion.

2. In this case, it is not necessary to determine whether the defendant had a reasonable expectation of privacy inside the trailer, because the box which contained the victim's body had been moved outside the trailer by a private person to an area normally open to the public. The box was unsealed and was made of cardboard. Because the defendant had no reasonable expectation of privacy in the box, the viewing of the contents of the box was not a search within the meaning of the Fourth Amendment.

3. The state constitution does not impose a standard of reasonableness for police conduct with respect to searches and seizures without warrants which is higher than that required by the federal constitution. Before the federal standard was declared, the state constitution imposed a standard of reasonableness at least as high as, but not in excess of, the standard later held to be required by the Fourth Amendment. As a remedy for violation of the state standard, a rule providing for the exclusion of evidence illegally seized by the police was adopted by case law. The state constitution was later amended to bar application of that exclusionary rule to a seizure of weapons or narcotics. The effect of the declaration of the federal exclusionary rule was considered during the 1961 Constitutional Convention, but language substantially similar to that of the former constitution was adopted. The inferences to be drawn are that the search and seizure provision as presented to the people was intended to be unchanged from the

previous constitution and that the people, in adopting the state constitution, understood that no restrictions would be placed upon searches and seizures more stringent than those required by the federal constitution.

4. Testimony that certain items offered as evidence at trial were seized at the office of defense counsel was admissible. The evidence, which was seized with a warrant and was only physical and non-testimonial, was volunteered by defense counsel and did not involve a violation of the attorney-client privilege. To withhold knowledge of where the evidence was found from the jury would not further the attorney-client privilege and would impair the truth-seeking function of a trial by diminishing or destroying the usefulness of evidence.

Justice Boyle, joined by Chief Justice Williams, agreed that the search and seizure of the box did not violate the defendant's state and federal constitutional rights and that evidence of the body and the bullets recovered from it was admissible, but wrote separately to note that the question whether an attorney may be compelled to testify that he received evidence from a defendant was not presented in this case because infringement of the attorney-client privilege was avoided when the sheriff testified that he seized the evidence from the office of defense counsel.

Justice Ryan, agreed that the search of the box and seizure of its contents did not violate the defendant's state and federal constitutional protection against search and seizure without a warrant, but wrote that admission of evidence that certain incriminating items which were independently linked to the defendant had been obtained from the office of defense counsel violated the defendant's attorney-client privilege and denied the defendant a fair trial. The most logical inference to be drawn from defense counsel's possession of the items was that they were given to him by the defendant. That fact was either privileged assertive conduct or the nonverbal behavioral component of a communication by the defendant to defense counsel which accompanied delivery of the items.

Justice Cavanagh, agreed that the search of the box in question and the seizure of its contents did not violate the defendant's state or federal constitutional rights, but stated that there is no need to decide whether the state constitution imposes a standard higher than the federal for review of police conduct during searches and seizures. It cannot be concluded that the state constitution does not impose a higher standard on the ground that the electorate has indicated disdain for the judicially created exclusionary rule. The state standard has no

relation to the rule imposed to deter violations of the standard. He agreed with Justice Ryan that admission of evidence seized in the office of defense counsel violated the defendant's attorney-client privilege, and that the conviction must be reversed.

Justice Kavanagh, joined by Justice Levin, would affirm the decision of the Court of Appeals reversing the conviction for the reasons given in that Court's opinion, which fully and accurately sets forth the law: the defendant had a reasonable expectation of privacy in the box when it was moved outside of, but within the curtilage of, her trailer and that the expectation was worthy of Fourth Amendment protection. Although there was probable cause to believe that a crime had been committed, there were insufficient exigent circumstances to justify an immediate search of the box without a warrant. Admission of evidence of the body of the victim found in the box and all of the evidence stemming from it was not harmless error in a prosecution based on mostly circumstantial evidence. Likewise, the revelation that certain incriminating evidence had been obtained from the defendant's attorney was more prejudicial than probative.

The judgment of the Court of Appeals reversing and remanding for a new trial is affirmed; but its holding on the search and seizure issue is reversed.

110 Mich App 428; 313 NW2d 307 (1981) affirmed as to result.

OPINION BY BRICKLEY, J.

1. SEARCHES AND SEIZURES — WITHOUT A WARRANT — LEGITIMATE EXPECTATION OF PRIVACY — ADMISSIBILITY OF EVIDENCE.

   *Evidence of the body of a victim and bullets recovered from it seized without a warrant outside a defendant's house trailer was admissible in a prosecution for second-degree murder where there was no search within the meaning of the Fourth Amendment because an unsealed cardboard box which contained the body had been moved outside the trailer by a private person into an area open to the public and the defendant no longer could claim an objectively reasonable or legitimate expectation of privacy (US Const, Am IV; Const 1963, art 1, § 11).*

2. SEARCHES AND SEIZURES — WITHOUT A WARRANT — LEGITIMATE EXPECTATION OF PRIVACY.

   *A person's right against unreasonable searches and seizures is intruded upon where governmental activity infringes on a justifiable or reasonable expectation of privacy; whether such*

*an expectation of privacy exists in both the subjective and objective sense is determined by scrutinizing the totality of circumstances surrounding the intrusion.*

3. SEARCHES AND SEIZURES — WITHOUT A WARRANT — ADMISSIBILITY OF EVIDENCE.

*The state constitution does not impose a standard of reasonableness for police conduct with respect to searches and seizures without warrants which is higher than that required by the federal constitution (US Const, Am IV; Const 1963, art 1, § 11).*

4. SEARCHES AND SEIZURES — OFFICES OF COUNSEL — ADMISSIBILITY OF EVIDENCE.

*Evidence that certain items offered as evidence during a prosecution for second-degree murder were seized at the office of defense counsel was admissible where a warrant was used to obtain the evidence and the evidence was only physical and non-testimonial and was volunteered by defense counsel without violating the attorney-client privilege.*

CONCURRING OPINION BY BOYLE, J.

5. ATTORNEY AND CLIENT — HOMICIDE — EVIDENCE — PRIVILEGED COMMUNICATIONS — WITHDRAWAL OF COUNSEL.

*The question whether a defendant's attorney may be compelled to testify in a murder trial that he possessed certain items which would incriminate the defendant and that he had received them from the defendant, which would have the effect of undermining the defense in the eyes of the finder of fact and would require withdrawal of defense counsel, was not presented in a case where a sheriff testified that he had seized the items at the office of defense counsel (DR 5-102[B]).*

OPINION CONCURRING IN PART AND DISSENTING IN PART BY RYAN, J.

6. ATTORNEY AND CLIENT — EVIDENCE — PRIVILEGED COMMUNICATIONS.

*Admission of evidence that certain incriminating items which were independently linked to the defendant had been obtained from the office of defense counsel violated the defendant's attorney-client privilege because the most logical inference to be drawn from defense counsel's possession of the items was that they were given to him by the defendant, and that fact was either privileged assertive conduct or the nonverbal behavioral component of a communication by the defendant to defense counsel which accompanied delivery of the items.*

OPINION CONCURRING IN PART AND DISSENTING IN PART BY
CAVANAGH, J.

7. SEARCHES AND SEIZURES — WITHOUT A WARRANT — ADMISSIBILITY
OF EVIDENCE.

*The standard required by the state constitution for review of
police conduct during searches and seizures has no relation to
the judicially created rule that evidence seized in violation of
the standard will be excluded at trial, and merely because the
electorate has indicated dislike for the rule it cannot be con-
cluded that the state standard is not higher than that imposed
by the federal constitution (US Const, Am IV; Const 1963, art
1, § 11).*

DISSENTING OPINION BY KAVANAGH, J.

8. SEARCHES AND SEIZURES — WITHOUT A WARRANT — EXPECTATION
OF PRIVACY.

*A defendant in a prosecution for second-degree murder had a
reasonable expectation of privacy in a box which was moved
outside, but was within the curtilage of, her trailer, and the
expectation was worthy of Fourth Amendment protection, pre-
cluding admission of evidence found without a warrant of the
body of the victim in the box and of bullets recovered from it,
where although there was probable cause to believe that a
crime had been committed, there were insufficient exigent
circumstances to justify the search (US Const, Am IV; Const
1963, art 1, § 11).*

9. SEARCHES AND SEIZURES — EVIDENCE — PLACE OF SEIZURE —
OFFICES OF COUNSEL — ADMISSIBILITY.

*Evidence that certain items offered as evidence during a prosecu-
tion for second-degree murder were seized with a warrant at
the office of defense counsel should not have been admitted
because the place of seizure was more prejudicial than proba-
tive.*

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, *Douglas A. Jacobson,*
Prosecuting Attorney, and *Leonard J. Malinowski,*
Assistant Attorney General, for the people.

State Appellate Defender (by *Stuart B. Lev)* for
the defendant.

BRICKLEY, J. Defendant was convicted of second-degree murder, MCL 750.317; MSA 28.549, for the shooting death of her husband, Douglas Leon Nash, and was sentenced to life imprisonment. The Court of Appeals reversed defendant's conviction and remanded the case for a new trial. *People v Nash,* 110 Mich App 428; 313 NW2d 307 (1981). We granted the prosecutor's application for leave to appeal, 414 Mich 869 (1982), to consider whether the Court of Appeals erred in holding that evidence of the body of the victim should have been suppressed at trial because it was discovered as a result of an unconstitutional search of the defendant's property. We also consider the holding of the Court of Appeals that while evidence against defendant obtained by the execution of a search warrant on defendant's attorney may be admitted at trial, the fact that the evidence was seized from the attorney cannot be made known to the jury. We would reverse the decision of the Court of Appeals on both holdings.

· I

Prior to trial, defendant moved to suppress all evidence of the victim's body and the bullets recovered from it. By stipulation, the motion was submitted to the trial court on the basis of the facts brought out at the preliminary examination.[1] After receiving an unfavorable decision on the motion defendant sought a rehearing, and an evidentiary hearing was held. The relevant evidence from the preliminary examination and from the evidentiary hearing showed that defendant and the victim lived in a house trailer rented from

[1] The practice of deciding search and seizure motions exclusively on the facts brought out at the preliminary examination is now prohibited. *People v Talley,* 410 Mich 378; 301 NW2d 809 (1981).

Margaret and Paul Ballard. Defendant was a few weeks behind in her rent as of the middle of January 1974, and had not recently been seen at the trailer. Neighbors had seen someone moving boxes out of the trailer.

On January 20, 1974, the Ballards received an inquiry about renting the trailer. Mr. Ballard went to the trailer with the prospective tenants. He found the trailer to be partially vacated and in a somewhat untidy condition, with wadded-up newspapers on the floor and a slight odor in the air. A large box, exuding a strong odor, was found extending from a closet. A mop bucket, also odorous, was in the bathroom. Mr. Ballard, with the help of his son, pushed the box out of the trailer and left it next to the door.

Upon returning home, Mr. Ballard told Mrs. Ballard about the box. He asked her to go to the trailer to check the box, as well as to clean up the red marks left by it in the trailer. Mrs. Ballard thought it possible that the box contained a body, but Mr. Ballard thought that it contained meat scraps for defendant's dogs.

On January 21, 1974, Mrs. Ballard went to the trailer. Defendant's dogs were not there. She found a 4′ × 17″ × 17″ cardboard box just outside the trailer's northwest door. The top of the box was slightly open and unsealed. She opened the box and saw what she thought might be the body of the victim.

Mrs. Ballard went directly to the sheriff's office and reported that "she thought maybe that there was a dead body" or "it could be bones or just cow hides" in the box on the property she was renting to defendant and Douglas Nash.

Mrs. Ballard, the sheriff, and others went out to the trailer. No search warrant was procured. After

being unable to see anything through a hole in an upper corner of the box, the sheriff opened it, revealing the badly decomposed body of Douglas Nash. Subsequent examination disclosed that the victim died as a result of two gunshot wounds, one from the front and one from the back, but both through the heart. Also, on January 21, 1974, defendant telephoned the Ballards to tell them she wished to continue renting the trailer and had left a rent check at Mr. Ballard's place of work.

The trial court made the following ruling:

"And the court is of the opinion that when this matter was reported to the sheriff by Mrs. Ballard or to his office and then to him, that the box being outside in full view and with the circumstances [that were] related to the sheriff by Mrs. Ballard, that the so-called search of the box was in full view, was within the search that the law allows under the circumstances."

Although we agree with the trial court's decision to deny the motion to suppress, we analyze the issue differently.

A search without a warrant, subject to certain exceptions not applicable here, is unreasonable per se under the Fourth Amendment to the United States Constitution. *Mincey v Arizona,* 437 US 385; 98 S Ct 2408; 57 L Ed 2d 290 (1978). Of course, not all government intrusions constitute searches within the meaning of the Fourth Amendment. One seeking the benefit of the Fourth Amendment must first carry the burden of showing that the Fourth Amendment is applicable. *Rawlings v Kentucky,* 448 US 98; 100 S Ct 2556; 65 L Ed 2d 633 (1980).

In *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), the United States

Supreme Court articulated the scope of Fourth Amendment protections. Stressing that the amendment protects persons and not places or areas, the Court found Fourth Amendment interests to be implicated when the governmental activity infringed on a justifiable, or reasonable, expectation of privacy. *Katz, supra,* p 353 (opinion of Stewart, J.), p 361 (opinion of Harlan, J.). As expressed in later cases, the issue to be decided is whether the defendant had a "legitimate expectation of privacy in the invaded place", *Rakas v Illinois,* 439 US 128, 143; 99 S Ct 421; 58 L Ed 2d 387 (1978). An expectation of privacy is legitimate if the individual has an actual, subjective expectation of privacy and that actual expectation is one that society recognizes as reasonable. *United States v Knotts,* 460 US 276; 103 S Ct 1081; 75 L Ed 2d 55 (1983). Whether an expectation of privacy exists in both the subjective and the objective sense is determined by scrutinizing the totality of circumstances surrounding the alleged intrusion. *United States v Hawkins,* 681 F2d 1343 (CA 11, 1982). See *Rawlings, supra; Rakas, supra* (opinion of Powell, J., concurring).

In the present case, it is by no means clear that defendant had retained any property interest in the rented premises. The United States Supreme Court has rejected the idea that " 'arcane distinctions developed in property * * * law' " are dispositive of Fourth Amendment rights. *Rakas, supra,* pp 149-150, fn 17. Yet property interests remain relevant. *United States v Salvucci,* 448 US 83; 100 S Ct 2547; 65 L Ed 2d 619 (1980). Without an interest, property or otherwise, in the premises, defendant would certainly have no right to complain of a search. We need not decide, however, whether defendant had a reasonable expectation of

privacy inside the trailer.[2] We find that in the circumstances in which the search actually took place defendant had no reasonable or legitimate expectation of privacy.

The box containing the victim had been moved outside of the trailer by Mr. Ballard. This action by a private person in no way involves the Fourth Amendment, which is limited to protecting persons from governmental intrusions. *Burdeau v McDowell*, 256 US 465; 41 S Ct 574; 65 L Ed 1048 (1921); *Coolidge v New Hampshire*, 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971). The location of the box after it was moved by Mr. Ballard was next to a trailer door. In the absence of special circumstances, this is an area normally open to the public. See *United States v Kramer*, 711 F2d 789 (CA 7, 1983); *United States v Magana*, 512 F2d 1169 (CA 9, 1975); *United States v Pruitt*, 464 F2d 494 (CA 9, 1972). Defendant has offered no evidence that visitors to the trailer were somehow barred from approaching the trailer door. The box was made of cardboard, certainly not a substance one would reasonably expect to keep out the curious. Perhaps even more importantly, the box was unsealed. Compare the reasonable expectation of privacy analyses in *United States v Chadwick*, 433 US 1; 97 S Ct 2476; 53 L Ed 2d 538 (1977) (reasonable expectation of privacy in a double-locked footlocker), and *Arkansas v Sanders*, 442 US 753;

---

[2] The Court of Appeals stated "that defendant had a reasonable expectation of privacy in the box, when moved outside the trailer but within the curtilage, worthy of Fourth Amendment protection". 110 Mich App 437. The Court went on to consider whether defendant had abandoned the property, defining abandonment as the combination of an act and the intent to abandon. Such a two-step analysis applies those "arcane distinctions developed in property * * * law" rejected by the United States Supreme Court. Those facts which would support the conclusion that the property had been abandoned are more properly considered in determining whether the defendant had a reasonable expectation of privacy in the first place.

99 S Ct 2586; 61 L Ed 2d 235 (1979) (reasonable expectation of privacy in unlocked, but closed, suitcase), with *United States v Neumann,* 585 F2d 355 (CA 8, 1978) (no reasonable expectation of privacy in an unsealed cardboard box), and *United States v Mackey,* 626 F2d 684 (CA 9, 1980) (no reasonable expectation of privacy in a paper bag).

One final factor which must be considered, although we ascribe to it little weight, is that the macabre contents of the box had already become known to Mrs. Ballard at the time of the alleged search. In *Walter v United States,* 447 US 649; 100 S Ct 2395; 65 L Ed 2d 410 (1980), six members of the United States Supreme Court, although reaching different conclusions, were of the opinion that an initial intrusion by a civilian into an area lessened any reasonable expectation of privacy. In the present case, while defendant may well have entertained a subjective expectation of privacy in the box as it stood in the trailer, the facts underlying that expectation had changed. The box had been moved out of the trailer and its contents viewed. Although a search by a civilian may not be able to defeat an otherwise reasonable expectation of privacy in the objective sense, it must somewhat lessen it. See, also, *Illinois v Andreas,* — US —; 103 S Ct 3319; 77 L Ed 2d 1003 (1983).

Under the totality of circumstances, we conclude that the cardboard box was not searched within the meaning of the Fourth Amendment. Whatever expectation of privacy defendant had in the contents of the box while it was in the trailer was defeated once the box was moved outside the trailer. Defendant's expectation of privacy was no longer objectively reasonable or legitimate under federal law.

Relying on this Court's statements in *People v*

*Secrest,* 413 Mich 521; 321 NW2d 368 (1982), defendant contends that evidence of the body of the victim should have been suppressed under the higher standard for police conduct required by article 1, § 11 of the Michigan Constitution of 1963. Defendant contends that the language of Const 1963, art 1, § 11, mandates application of our state's exclusionary rule when police conduct does not meet this higher standard.

US Const, Am IV, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Const 1963, art 1, § 11, provides:

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state."

In *Secrest, supra,* p 525, we compared the language of the two constitutional provisions. Even though our decision in that case was based on an analysis of federal law, we stated:

"There are differences in wording between the two. As a result, we have imposed a higher standard under the state provision than the federal when the item

seized is not one within the proviso of the third sentence of art 1, § 11. *People v Moore,* 391 Mich 426, 435; 216 NW2d 770 (1974); *People v Beavers,* 393 Mich 554, 567-568; 227 NW2d 511 (1975)."

To the extent the above statement is read to mean that this Court, in construing the Michigan Constitution, has applied a standard for police conduct higher than that required by the federal constitution in all instances where weapons or narcotics are not involved, we disapprove.

The technical rules of statutory construction do not apply when construing a constitution. *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971). Instead, our task is to divine the "common understanding" of the provision, that meaning "which reasonable minds, the great mass of the people themselves, would give it". Cooley, Const Limitations (6th ed), p 81. Words are to be given their ordinary meaning. Regard must also be given to the circumstances leading to the adoption of the provision and the purpose sought to be accomplished. *Kearney v Board of State Auditors,* 189 Mich 666, 673; 155 NW 510 (1915). The constitutional convention debates and the address to the people, though not controlling, are relevant. *Beech Grove Investment Co v Civil Rights Comm,* 380 Mich 405; 157 NW2d 213 (1968).

Const 1908, art 2, § 10, as originally adopted by the people, provided:

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation."

Although not required to do so by the federal

constitution, in *People v Marxhausen,* 204 Mich
559; 171 NW 557 (1919), this Court adopted the
exclusionary rule as the remedy for violations of
Const 1908, art 2, § 10. See, also, *Weeks v United
States,* 232 US 383; 34 S Ct 341; 58 L Ed 652
(1914); *Wolf v Colorado,* 338 US 25; 69 S Ct 1359;
93 L Ed 1782 (1949).

In *People v Stein,* 265 Mich 610; 251 NW 788
(1933), this Court applied our state exclusionary
rule to reverse the defendant's conviction of carry-
ing an unlicensed weapon on the ground that the
weapon had been unconstitutionally seized. Hard
on the heels of this Court's decision in *Stein,* the
people of the State of Michigan reaffirmed Const
1908, art 2, § 10, but added the following proviso:

*"Provided, however,* That the provisions of this sec-
tion shall not be construed to bar from evidence in any
court of criminal jurisdiction, or in any criminal pro-
ceeding held before any magistrate or justice of the
peace, any firearm, rifle, pistol, revolver, automatic
pistol, machine gun, bomb, bomb shell, explosive, black-
jack, slungshot, billy, metallic knuckles, gas-ejecting
device, or any other dangerous weapon or thing, seized
by any peace officer outside the curtilage of any dwell-
ing house in this state." 1935 Joint Resolution No 1,
ratified November 3, 1936.

Language prohibiting the exclusion from evidence
of "any narcotic drug or drugs" was added to the
list of items in 1952. 1952 Joint Resolution No 1,
ratified November 4, 1952.

This Court enforced the people's will in *People v
Gonzales,* 356 Mich 247; 97 NW2d 16 (1959), and
*People v Winkle,* 358 Mich 551; 100 NW2d 309
(1960), and allowed the admission of weapons into
evidence even though they were unconstitutionally
seized. Thus, as of 1960, it is relatively clear that
while Const 1908, art 2, § 10 imposed at least as

high a standard on police conduct as did the
Fourth Amendment, the people of this state were
not willing to enforce Const 1908, art 2, § 10 with
an exclusionary rule when certain evidence was
unconstitutionally seized.[3] On June 19, 1961, how-
ever, the United States Supreme Court decided
*Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d
1081 (1961).

In *Mapp,* three police officers entered the defen-
dant's house without a warrant and engaged in
what the majority opinion described as "official
lawlessness" and "a flagrant abuse" of basic rights.
367 US 655. The entire house was searched and,
though the police were looking for a person and
information relating to a bombing, obscene materi-
als were seized. Despite the unusual facts of the
case, the holding was quite broad: the states were
required to apply the exclusionary rule to Fourth
Amendment violations in all cases.

The focus of the Michigan Constitutional Con-
vention of 1961 was on the effect of *Mapp* on the
third sentence of Const 1908, art 2, § 10. The
Committee on Declaration of Rights, Suffrage, and
Elections proposed that the final sentence of Const
1908, art 2, § 10 be deleted in favor of the phrase
"Evidence obtained in violation of this section
shall not be used except as authorized by law".
The committee reasoned that the broad holding of
*Mapp* may have invalidated the final sentence of
Const 1908, art 2, § 10. The merits of that sentence

---

[3] Both the United States Constitution and the Michigan Constitu-
tion prohibit unreasonable searches. In *Wolf v Colorado, supra,* the
United States Supreme Court held that the Fourth Amendment
prohibition against unreasonable searches was applicable to the states
through the Due Process Clause of the Fourteenth Amendment. The
Court, however, declined to also apply the Fourth Amendment rem-
edy of the exclusionary rule to the states. Therefore, prior to *Mapp,*
the Michigan definition of an unreasonable search could be no less
than the federal definition. Michigan was, nevertheless, free to apply
or not apply its state exclusionary rule when it chose to do so.

were also considered by the committee. The committee added the phrase "except as authorized by law" because:

"Should the definition of the federal limits imposed on the States with respect to the admissibility of evidence change in the future, the Michigan Legislature and the Michigan courts could incorporate, in statute and court decisions, those rules with respect to the admissibility of evidence which reflect the opinion of the Legislature and the Michigan courts as to what ought to constitute sound practice in this State, subject only to the continuing recognition of the limits set by federal constitutional supremacy." Committee Proposals and Reports, Constitutional Convention 1961, Supporting Report, Committee Proposal No 15, pp 7, 10.

It therefore appears that the committee was attempting to allow for the possibility of a less stringent application of the exclusionary rule if allowed by federal law, rather than attempting to strengthen Michigan search and seizure protection.

The debates of the committee of the whole at the convention considered both the merits of, and the effect of *Mapp* on, Const 1908, art 2, § 10. See 1 Official Record, Constitutional Convention 1961, pp 464-484, 488-533, 674-688. The view that *Mapp* was limited to searches of dwellings and that a limitation on the exclusionary rule was proper on the merits carried the day. Attempts to unite Michigan and United States search and seizure law by adopting the exact language of the Fourth Amendment in the proposed Michigan Constitution were defeated. Instead, the anti-exclusionary-rule proviso of Const 1908, art 2, § 10 was amended back into the proposed constitution. 1 Official Record, Constitutional Convention 1961, pp 531-688. Ultimately, language substantially similar to that of

Const 1908, art 2, § 10, as amended, was adopted by the convention and recommended to the people.

The convention's address to the people stated that proposed Const 1963, art 1, § 11 was "No change from Sec. 10, Article II, of the present constitution except for improvement in phraseology". 2 Official Record, Constitutional Convention 1961, p 3364. Indeed, the common understanding of the people upon reading the proposed constitutional provision could be nothing but the belief that the search and seizure provision of the new constitution represented no change. There had been no substantive alterations. There is no indication that in readopting the language of Const 1908, art 2, § 10 in Const 1963, art 1, § 11 the people of this state wished to place restrictions on law enforcement activities greater than those required by the federal constitution. In fact, the contrary intent is expressed.

With the advantage of hindsight, we know that those who subscribed to a limited view of *Mapp* were in error. Yet such a view was not unreasonable at the time. See *In re Winkle,* 372 Mich 292; 125 NW2d 875 (1964) (opinion of Kelly, J.); *People v Blessing,* 378 Mich 51; 142 NW2d 709 (1966) (opinions of Kelly, O'Hara, and Black, JJ.). In *People v Pennington,* 383 Mich 611; 178 NW2d 471 (1970), however, this Court recognized the supremacy of federal law and held unconstitutional the final sentence to Const 1963, art 1, § 11, to the extent it conflicted with *Mapp.* Still, in *People v Moore,* 391 Mich 426; 216 NW2d 770 (1974), we gave limited force to the final sentence of Const 1963, art 1, § 11. We stated that that sentence precludes a higher standard of reasonableness for searches that uncover narcotics or firearms than the standard imposed on us by federal law.

Necessarily subsumed in our statement in *Moore* is the conclusion that Const 1963, art 1, § 11 does not preclude a standard higher than the federal standard. When the people of this state adopted the third sentence of Const 1963, art 1, § 11, they also adopted the first, two. Those sentences, nearly identical to those contained in the Fourth Amendment, had been part of Michigan's Constitutions since 1835. See Const 1835, art 1, § 8; Const 1850, art 6, § 26. It was under those sentences that this Court created a body of state constitutional search and seizure law and adopted an exclusionary rule, all before either was subject to a federal floor. We cannot necessarily view the final sentence of Const 1963, art 1, § 11 as an interdiction against evolving concepts of reasonableness under the first two sentences. Though the people of the State of Michigan have corrected this Court when they have believed it to have gone too far, the historical general power of this Court to construe the constitutional provision relating to searches and seizures has not been removed. The history of Const 1963, art 1, § 11, and its plain import, however, suggest that its further expansion, with the concomitant expansion of the exclusionary rule to enforce it, should occur only when there is a compelling reason to do so.

Defendant suggests that we read *People v Secrest* to mean that because there can be no heightened standard of reasonableness when weapons or narcotics are seized, there is a heightened standard in all other cases. Considering the history and language of Const 1963, art 1, § 11, it would be an incredible act of illogic to do so. We have, on occasion, construed the Michigan Constitution in a manner which results in greater rights than those given by the federal constitution, see, *e.g., People v*

*Beavers,* 393 Mich 554; 227 NW2d 511 (1975), and
where there is compelling reason, we will undoubt-
edly do so again. We have not, however, created
any per se higher standard just because weapons
and narcotics are not involved.[4]

We can conceive of no reason why the search of
a cardboard box outside the door of a dwelling
should be subject to a standard of reasonableness
higher than that required by the Fourth Amend-
ment. We hold that the evidence of the body of the
victim and the bullets recovered from it was prop-
erly introduced at trial in this case.

## II

We next consider whether evidence that items
were seized from the office of defendant's attorney
was properly introduced at trial.

Sometime prior to defendant's preliminary ex-
amination, the prosecutor received a letter from
defense counsel, which stated:

---

[4] Our brother Justice CAVANAGH, in dissenting to this analysis, is
correct when he notes that the standard of reasonableness and the
application of the exclusionary rule under the Michigan Constitution
should be analytically separate inquiries. Unfortunately, the assump-
tion that the standard of reasonableness and the remedy for breach of
that standard are inexorably linked permeates prior decisions of this
Court. This Court's statement in *Moore, supra,* that the anti-exclu-
sionary-rule proviso of art 1, § 11 precluded a standard of reasonable-
ness higher than that of the federal constitution when weapons or
narcotics are involved likewise makes this analytically incorrect
assumption. *Secrest* merely expanded on that incorrect assumption to
state that when weapons or narcotics are not involved, the standard
of reasonableness for searches that reveal all other items must be
higher.

We, therefore, are left with whether our analysis of issues involving
standard of reasonableness and the anti-exclusionary-rule proviso
should be as it has been or as it should be. Were we writing on a
blank slate, we would separate our analyses of whether the Michigan
Constitution has been violated and whether that violation calls for
application of the Michigan common-law exclusionary rule. To do so
now, however, would necessitate overruling both *Moore* and *Secrest.*

"Pursuant to an informal ethics opinion received from the State Bar of Michigan, I am advising you hereby that I have in my office * * * certain materials which may constitute evidence in this matter."

The letter listed:

"1) wallet and contents; 2) box, believed to contain ammunition; 3) revolver, believed to contain two (2) spent cartridges; and 4) holster."

Several days later, the police arrived at defense counsel's office and presented a search warrant for the items listed in his letter. Defense counsel's partner produced for the officers two bags, one containing the wallet, which belonged to the victim, and another containing the revolver, which was later determined to be the murder weapon, ammunition, and the holster. The officers took possession of the bags and departed.

During trial, the officer who executed the warrant testified for the prosecution, without objection, that the revolver, wallet, ammunition, and holster had been seized during the execution of a search warrant at defense counsel's office. The prosecutor commented on the location of the evidence when seized during his closing argument to the jury.

The Court of Appeals found that defense counsel had a duty to turn the physical evidence over to the police and that so doing did not violate the attorney-client privilege. It accepted defendant's argument that it was, however, a violation of the attorney-client privilege for the police officer to testify that the physical evidence was seized from the office of defense counsel, specifically adopting the approach of the Washington Supreme Court in *State ex rel Sowers v Olwell,* 64 Wash 2d 828; 394

P2d 681 (1964). Additionally, the Court found that admission of the source of the physical evidence was more prejudicial than probative, in violation of MRE 403. Defendant contends in this Court, as she did in the Court of Appeals, that the introduction of the evidence, was error requiring reversal, implicating the attorney-client privilege and the Sixth Amendment.[5]

At the outset, we express our dismay over what is reported to be an increasing trend toward law office searches, with concern that such a practice may take root in this state. The issue of the propriety of third-party searches, and more particularly the search of law offices, is receiving growing judicial attention. See, *e.g., Law Offices of Bernard D Morley, PC v MacFarlane,* 647 P2d 1215 (Colo, 1982); *O'Connor v Johnson,* 287 NW2d 400 (Minn, 1979); *Deukmejian v Los Angeles Superior Court,* 103 Cal App 3d 253; 162 Cal Rptr 857 (1980); Bloom, *The Law Office Search: An Emerging Problem and Some Suggested Solutions,* 69 Georgetown L J 1 (1980). The specter of law-enforcement officers rummaging through the files and papers of a nonsuspect lawyer's office has grave implications involving not only the attorney-client privilege of the suspect and all other clients of the attorney, but also the constitutional rights against self-incrimination and of counsel. See Note, *The Assault on the Citadel of Privilege*

---

[5] No direct evidence was ever introduced at trial that defendant gave the items in question to defense counsel. Defendant moved in the Court of Appeals for remand to the trial court for the purpose of establishing a factual basis for the claim of the attorney-client privilege. The motion was opposed by the prosecutor and was denied. The prosecutor now contends that there are insufficient facts in the record for this Court to evaluate the claim of the privilege. Defendant has admitted in this Court giving the items to defense counsel, and we accept that admission. Given that admission, however, and because no objection was raised in the trial court, we find no error under MRE 403 on the facts of this case.

*Proceeds Apace: The Unreasonableness of Law Office Searches,* 49 Fordham L Rev 708 (1981). Although the United States Supreme Court has ruled nonsuspect searches constitutional, *Zurcher v Stanford Daily,* 436 US 547; 98 S Ct 1970; 56 L Ed 2d 525 (1978), the troubling nature of this activity remains. Because this Court is normally limited to the strictures of the case before it, and because multifarious and competing policy considerations are involved, this activity lends itself particularly well to legislative action. See, *e.g.,* the innovative approach of the California Legislature in California Penal Code § 1524, which requires the appointment of an attorney special master to conduct the search of a nonsuspect professional whose clients have a state law privilege. See, also, 42 USC 2000aa-11(a) and 28 CFR 59.1 *et seq.;* Or Rev Stat, § 9.695.

The case before us presents a narrower issue, one which does not require us to consider all the ramifications of third-party searches. But we hope that before such a case comes before this Court our Legislature examines the use of third-party search warrants, at least as they are directed at law offices.

In the present case, there was no challenge made to the execution of the warrant. The warrant sought only physical, non-testimonial evidence. No documentary evidence was sought or seized, and the law office files were not subjected to a search. Finally, the evidence was volunteered and surrendered in a manner that leads us to believe that the use of the warrant was a needless formality. We therefore consider here only the question whether the officer's testimony that the evidence was seized from defense counsel's office was proper.

Although this Court has never addressed whether an attorney must voluntarily turn over to the police physical evidence of a crime received during the representation of a client, those jurisdictions that have addressed the question have found that such a duty exists, particularly when the evidence is the instrumentality of a crime or contraband. See, *e.g., In re Ryder,* 381 F2d 713 (CA 4, 1967), *affirming* 263 F Supp 360 (ED Va, 1967); *People v Swearingen,* 649 P2d 1102 (Colo, 1982); *Morrell v Alaska,* 575 P2d 1200 (Alas, 1978); *State ex rel Sowers v Olwell, supra; Anderson v State,* 297 So 2d 871 (Fla App, 1974). We align Michigan with those jurisdictions on that question and find that defense counsel acted properly in notifying the police of his possession of the evidence.

The purpose of the attorney-client privilege is to foster open communications between attorney and client. *Lindsay v Lipson,* 367 Mich 1; 116 NW2d 60 (1962). The privilege is personal to the client and cannot be waived by the attorney without the client's permission. *Schaibly v Vinton,* 338 Mich 191; 61 NW2d 122 (1953). The result of the privilege, however, requires that its scope be kept carefully circumscribed:

"[T]he privilege remains an exception to the general duty to disclose. Its benefits are all indirect and speculative; its obstruction is plain and concrete. * * * It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." 8 Wigmore, Evidence (McNaughton rev), § 2291, p 554.

That the evidence involved in the present case was physical and non-testimonial is not disputed. Less

certain, and in dispute, is whether testimony relating to the source of the physical evidence is testimony which infringes on the attorney-client privilege.

In *Olwell, supra,* the attorney was served with a subpoena *duces tecum,* which directed his presence at a coroner's inquest and ordered him to produce any knives in his possession that belonged to certain persons. At the hearing, the attorney refused to testify about or produce a knife that was owned by his client. The attorney was cited for contempt of court. In reversing the order of contempt, the Washington Supreme Court held that the subpoena was defective on its face for requiring the attorney to testify about information received from the client. The court added:

"We do not, however, by so holding, mean to imply that evidence can be permanently withheld by the attorney under the claim of the attorney-client privilege. Here, we must consider the balancing process between the attorney-client privilege and the public interest in criminal investigation. We are in agreement that the attorney-client privilege is applicable to the knife held by appellant, but do not agree that the privilege warrants the attorney, as an officer of the court, from *[sic]* withholding it after being properly requested to produce the same. The attorney should not be a depository for criminal evidence (such as a knife, other weapons, stolen property, etc.), which in itself has little, if any, material value for the purposes of aiding counsel in the preparation of the defense of his client's case. * * * It follows that the attorney, after a reasonable period, should, as an officer of the court, on his own motion turn the same over to the prosecution.

"We think the attorney-client privilege should and can be preserved even though the attorney surrenders the evidence he has in his possession. The prosecution, upon receipt of such evidence from an attorney, where charge against the attorney's client is contemplated

(presently or in the future), should be well aware of the existence of the attorney-client privilege. Therefore, the state, when attempting to introduce such evidence at the trial, should take extreme precautions to make certain that the source of the evidence is not disclosed in the presence of the jury and prejudicial error is not committed." *Olwell, supra,* 64 Wash 2d 833-834.

We find the *Olwell* court's analysis less than convincing. The court found the knife to be privileged, but, nevertheless, held that it had to be turned over to the police by the attorney. The court attempted to solve this dilemma by allowing the introduction of the evidence while keeping its source a secret. We not only have difficulty accepting the inconsistency of allowing privileged items into evidence, but we are further troubled by the result of the application of the *Olwell* principles.

The jury in the present case had before it evidence of a body with two bullet wounds. Evidence had shown that the revolver in question was the murder weapon, that the revolver belonged to the victim, and testimony was received that showed that defendant had previous access to it. Application of *Olwell* would create a gap in the sequence of events that would link the gun to the accused, leaving the jury to speculate as to how the police had obtained the revolver. Application of *Olwell* to the wallet and the ammunition, even where defendant's fingerprints were found on two of the bullets, would withhold from the jury the identity of the previous possessor of the items and render relevant evidence meaningless. Yet there would be no appreciable increase in the protection of communications. Only the client's possession of relevant physical evidence would be protected, making the attorney a participant in the destruction, in the evidentiary sense, of relevant evidence.

The physical evidence in *Olwell,* like the physical evidence in the present case, was not a confidential communication. In both *Olwell* and the present case, the attorney gained knowledge of the evidence as a result of a confidential communication. The flaw in the *Olwell* court's reasoning, however, is that the privilege is extended to an attorney's possession of a physical item, rather than to the knowledge gained from a confidential communication. The court is, therefore, forced to reconcile the principles of the attorney-client privilege with the seemingly inconsistent rule that an attorney has a duty to turn over physical evidence. It did so by making inadmissible the fact that the police received the evidence from the attorney. Such a rule does nothing to further the purpose of the attorney-client privilege and instead merely acts to impair the truth-seeking function of a trial.

We find the approach taken by the court in *People v Meredith,* 29 Cal 3d 682; 175 Cal Rptr 612; 631 P2d 46 (1981), to have a more compelling rationale and practical application.

In *Meredith,* the attorney learned from the defendant that the defendant had disposed of incriminating evidence (a partially burned wallet belonging to the victim) in a trash barrel behind a codefendant's residence. The attorney had his investigator go to the scene, retrieve the wallet, and bring it back to the law office. The attorney then voluntarily turned the wallet over to the police, with the agreement that it could be introduced into evidence. At trial, the investigator testified as to the location of the wallet when it was found.

The California Supreme Court noted the conflicts that are inherent when a claim of the attorney-client privilege is involved. As does the present case, *Meredith* presented the court with a case

where the location of physical evidence was important. Referring to the "venerable" case of *State v Douglass,* 20 W Va 770 (1882), as well as more recent decisions such as *Olwell,* the court concluded that the attorney-client privilege extended not only to communications, but also to observations made as a consequence of protected communications. The court, however, distinguished cases where the attorney's actions somehow alter the evidence, either by actual alteration or by moving it from its location. In these cases, the interruption of the chain of custody requires that evidence of the item's original condition or location be admitted at trial. We think that this approach, in contrast to the approach of *Olwell,* properly draws the line of admissibility at the most logical and workable point, where the scope and purpose of the privilege declines and the truth-seeking interest of the administration of justice rises.

We agree with the California Supreme Court that the approach taken over a hundred years ago in *Douglass* is still the proper approach today. The attorney-client privilege extends not only to communications, but to observations made as a result of communications with an attorney. Defense counsel in the present case could not have been forced to testify that he saw the revolver in defendant's possession, so long as the observation resulted from a confidential communication. But we also see a difference between an attorney observing evidence and knowing of its location and an attorney taking possession of evidence from a place he has learned about from his client. In the latter case the attorney diminishes, if not destroys, the usefulness of evidence. And it makes no difference that the "place" from where the evidence is taken is the client. We agree with the California

Supreme Court that a contrary rule "might encourage defense counsel to race the police to seize critical evidence". *Meredith, supra,* p 694.

We draw further support from *In re 1976 Grand Jury,* 534 F2d 719 (CA 7, 1976), where defense counsel accepted money from his client knowing that it was the proceeds of a bank robbery. In upholding a lower court finding that the defense counsel was in contempt for refusing to honor a grand jury subpoena ordering him to produce the money received, the court held that the delivery of money from the defendant to the attorney was not a privileged communication. The money itself was non-testimonial. Except for the court's reference to criminal conduct, its reasoning is applicable here:

"The delivery of the money was not assertive conduct and therefore was not a privileged communication, and, as we just observed, the money itself is non-testimonial. * * * There is no authority or reason, based on any constitutional provision or the attorney-client privilege, for shielding from judicial inquiry either the fruits of the robbery or the fact of the later criminal act of turning over the money to appellant. Accordingly, it is immaterial that in responding to the subpoena appellant will be making an assertion about who turned over the money and when." *Id.,* p 731 (majority opinion).

We are satisfied that the principles we set down today adequately protect the Sixth Amendment right to counsel. The attorney-client privilege does not extend to protect situations where the attorney has in some way altered the character of evidence, including where the attorney has taken the evidence into his possession. The attorney may, of course, take possession of physical evidence when necessary to prepare for the defense of the client. He will do so, however, with the knowledge that the evidence must, within a reasonable

time, be turned over to the applicable authorities and that his alteration of the character of the evidence by removal from its source or otherwise will not be privileged evidence at trial.

We do not wish to see the law office become a depository for contraband and instrumentalities of crime. These principles do not require defense counsel to do the work of the police for them. But neither do they allow the attorney to interrupt the work of the police by standing in the way of the normal flow of evidence.

In view of the foregoing, the trial court did not err in allowing into evidence testimony that items were seized from the office of defense counsel.

BOYLE, J. I concur in the result and rationale of Justice BRICKLEY'S opinion in all respects except insofar as it can be read as permitting an attorney to be compelled to testify that he received evidence from the defendant. The instant case does not present this question since any infringement of the privilege was avoided because the sheriff testified regarding his seizure of the evidence from the attorney's office.

Justice BRICKLEY'S rationale would require defendant's attorney to testify not only that the gun was in his possession, but that it was received from the defendant. Since the specter of defendant's own attorney testifying against him or her would have the effect of undermining the defense in the eyes of the factfinder, it would appear that the attorney would have to be disqualified. DR 5-102(B).

This issue raises difficult and far-ranging questions regarding the conflict between an attorney's responsibility to the public and counsel's responsibility to the client. I think we should not deal with

this question until we are presented with a record that compels a resolution.

WILLIAMS, C.J., concurred with BOYLE, J.

RYAN, J. I concur in the reasoning and result of part I of Justice BRICKLEY's opinion, holding that the search of the box in question and seizure of the contents did not violate the defendant's state[1] and federal[2] constitutional protection against a warrantless search and seizure.

I do not agree, however, with my brother's treatment of the attorney-client privilege issue in part II of the opinion. Like Justice KAVANAGH, I am of the view that this issue was correctly decided by the Court of Appeals.

When the prosecuting attorney produced evidence that the revolver, wallet, ammunition, and holster, which were independently linked to the defendant, had been obtained from the defense counsel's office, the defendant's attorney-client privilege was violated.[3]

Certainly the articles seized from the defense counsel's office were not "privileged" in any attorney-client privilege sense. However, the circumstantial evidence that the items were delivered to the attorney by the defendant was an integral part of the defendant's confidential communications to her attorney concerning the case against her.

---

[1] Const 1963, art 1, § 11.

[2] US Const, Am IV.

[3] As Justice BRICKLEY notes in his opinion, *ante,* p 216, the defendant's counsel did not object on attorney-client privilege grounds to the admission of the officer's testimony that he recovered the evidence from the defendant's attorney's office. However, as Justice BRICKLEY correctly notes later in his opinion, *ante,* p 219, the attorney's failure to object does not preclude the defendant from asserting the privilege since the privilege is personal to the client and cannot be waived by the attorney absent the client's permission. *Schaibly v Vinton,* 338 Mich 191; 61 NW2d 122 (1953).

The most logical inference to be drawn from the defense counsel's possession of the incriminating evidence, and the one the prosecutor undoubtedly intended would be drawn, was that the items were handed to the defense counsel by his client. That fact, circumstantially proved by showing that the items were obtained from the defense counsel's office, was either privileged assertive conduct or, at the very least, was the nonverbal behavioral component of any communication from the defendant to her attorney which accompanied delivery of the items.[4]

As my brother BRICKLEY observes, it was the defense attorney's duty to turn the items over to the police, and he did so. At the same time, it was the prosecuting attorney's duty to respect the privileged confidentiality of the fact that the most logical inference to be drawn from the defense counsel's possession of the items was that they came to him from the defendant. The prosecutor violated that duty by disclosing to the jury that the articles were obtained from the defense counsel's office.

While it is quite true, as my brother observes, that respecting the attorney-client privilege in that way "would create a gap in the sequence of events that would link the gun to the accused, leaving the jury to speculate as to how the police had obtained the revolver", it is a settled and

---

[4] Needless to say, there is no record evidence of any communication from the defendant to her lawyer associated with the delivery of the items in question, nor could there be, unless the defendant wished to waive her attorney-client privilege and give evidence on the point or permit her attorney to do so.

Just as it is logical to infer from the defense counsel's unexplained possession of the articles in question that they were delivered to him by his client, it is equally logical to infer that the delivery was accompanied by some explanatory statement associating the articles with the pending prosecution.

accepted principle of our jurisprudence that privileged communications between lawyer and client are protected at some expense to the truth-seeking process. While it would be preferable that the jury know all of the facts of the case, including theoretically all statements made by the defendant to anyone including her lawyer, we accept in our jurisprudence a measure of interference with full disclosure of all the facts as a price worth paying to encourage free, full, and fearless communication by a client to a lawyer. In this case, the price was an absence of evidence as to the location from which the police obtained the incriminating items. A disclosure to the jury of the source of the incriminating items violated the defendant's attorney-client privilege and denied the defendant a fair trial.

I would affirm the decision of the Court of Appeals.

CAVANAGH, J. I concur in the result, but not the reasoning, of Part I of my brother BRICKLEY's opinion insofar as it holds that the search of the box in question and the seizure of its contents did not violate defendant's state and federal constitutional rights to be free from unreasonable searches and seizures. However, there is no need to decide in this case whether art 1, § 11 of the state constitution imposes a higher standard by which to review police conduct during searches and seizures than does the Fourth Amendment to the federal constitution. Rather, that issue should not be addressed until presented in a case which requires its resolution. Accordingly, we need not overrule in part our recent decision in *People v Secrest*, 413 Mich 521; 321 NW2d 368 (1982).

I especially take exception to the reasoning of my brother BRICKLEY's opinion insofar as its con-

clusion that there is no higher standard under the
state constitution is based on the electorate's ad-
mitted disdain for the exclusionary rule. That rule
is merely a remedy created and imposed by the
judiciary to deter unconstitutional police conduct;
it is not mandated by either the state or the
federal constitution. Indeed, reasoning which con-
cludes that the state constitution does not require
a higher standard by which to review police con-
duct during searches and seizures merely because
the people of this state dislike the remedy imposed
to deter police conduct which violates the standard
imposed by that constitution is faulty. Simply
stated, the standard required by the state constitu-
tion has no relation to the judicially created, but
not constitutionally mandated, remedy imposed to
deter violations of that standard.

Finally, I agree with my brother RYAN's analysis
and conclusion as to the issue regarding the attor-
ney-client privilege in this case. Accordingly, I do
not join Part II of my brother BRICKLEY's opinion,
but agree that the defendant's conviction must be
reversed.

KAVANAGH, J. Judge MACKENZIE's opinion for
the Court of Appeals in *People v Nash,* 110 Mich
App 428; 313 NW2d 307 (1981), addressing the
failure of the trial court to suppress evidence
seized from the box in front of defendant's abode,
fully and accurately sets forth the law. That
Court's decision to reverse and order suppression
is correct for the reasons stated therein and should
be affirmed.

Likewise the decision that it was error to allow
the jury to learn the source of the evidence ob-
tained by warrant from defendant's attorney was
correct for the reasons Judge MACKENZIE stated
and, hence, should also be affirmed.

Her opinion also treats of other issues raised on appeal to that Court, but not pressed on appeal here. Accordingly, we express no opinion thereon.

We would affirm.

Levin, J., concurred with Kavanagh, J.