WATERMAN, Justice
(dissenting).
I respectfully dissent and join the separate dissent of Justice Zager. The majority correctly concludes this traffic stop and arrest were lawful, but then effectively overrules our precedent by requiring suppression of the firearm and narcotics found in the search of the safe behind the driver’s seat. In my opinion, this was a lawful search based on either of two exceptions to the warrant requirement: the automobile exception or the search-incident-to-arrest exception. Today’s opinion unduly restricts police searches and creates practical problems undermining public safety. I would affirm the district court’s eviden-tiary ruling that applied precedent allowing police to search contemporaneously the vehicle’s entire passenger compartment (including containers) at the scene when probable cause supports the arrest of the driver.
The majority disregards how the parties framed the issues and briefed the appeal. Both parties recognized the automobile exception is at issue, yet the majority fails to address that alternative ground for upholding the search. The parties’ briefs and the majority opinion are two ships passing in the night. The bench and bar will have to read today’s tea leaves to guess the fate of the automobile exception in the next appeal. In my view, that exception should remain good law. The majority also disregards the State’s extensive survey of courts and commentators supporting use of neutral interpretive principles to guide departures from • federal precedent when we interpret identical provisions of the state constitution. The majority’s standardless approach appears result-oriented and provides no guidance. I reiterate my call for our court to adopt neutral interpretive criteria. Applying such criteria here, I would give the same words the same meaning in the Iowa and federal search and seizure provisions, apply existing precedent, and thereby affirm Gaskins’s convictions.
*39 I. Additional Relevant Facts.
The reader should know some additional relevant facts missing from the majority opinion. The majority minimizes the drugs found in the search of the van as “several” small plastic bags of marijuana and pipes. The district court’s ruling is more informative:
The safe contained: “The Regent” 22 caliber revolver with a scratched off serial number loaded with eight bullets, a scale with marijuana residue, one larger sandwich bag[ ] containing eleven smaller sandwich bag[s] filled with ... marijuana, one plastic sandwich bag[] with a larger ball of ... marijuana, one box of sandwich bag[s], several larger ... freezer bags with an odor of “raw” marijuana, and various pipes and “one hitter” pipes.
... Ultimately, there [were] over forty-two grams of marijuana inside of Gas-kinses] vehicle. Officers testified that the weight and the bag[s] were indicative of resale and distribution of narcotics. Additionally, persons who engage in resale of marijuana typically carry weapons, like the one found in the safe, for protection.
All of the empty plastic bags tested positive for the presence of marijuana, as did the residue on the scale. The revolver contained Gaskins’s fingerprints. The officer who conducted the search of the van testified at the suppression hearing that the safe was within the reach of both Gaskins and his passenger at the time of the stop.
The majority also gives short shrift to relevant testimony at the suppression hearing. Officer Tatum, who initially arrested Gaskins, testified, “People that purchase drugs or sell drugs, they have a tendency not to carry them on their person, they usually hide them in specific places.” Officer Tatum further testified that he thought a search of the van would find more drugs in the vehicle, for several reasons. First, he smelled marijuana from within the van; second, Gaskins initially lied to him by denying that he had any drugs; and third, Gaskins then handed over the single, partially smoked blunt. As Officer Tatum testified, “Most people that use drugs or sell drugs, ... have a tendency to carry weapons.” Therefore, he was concerned that Gaskins had a weapon in the van, as well as items related to drug offenses. These facts further support the district court’s findings that the police had probable cause to search the van at the scene, including the safe within Gaskins’s reach at the time of the stop.
II. The District Court Should Be Affirmed Under Existing Iowa and Federal Precedent.
The search of Gaskins’s van was constitutional under our court’s precedent and the Fourth Amendment decisions of the United States Supreme Court. The majority not only departs from federal decisions, it overturns our own caselaw adopting those decisions, violating the principle of stare decisis. Our court in a unanimous decision recently stated, “Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law.” Book v. Doublestar Dongfeng Tyre Co., 860 N.W.2d 576, 594 (Iowa 2015); see also Ackelson v. Manley Toy Direct, L.L.C., 832 N.W.2d 678, 688 (Iowa 2013) (“We are slow to depart from stare decisis and only do so under the most, cogent circumstances.”). Indeed, it is difficult to overstate the importance of stare decisis:
It nearly goes without saying that the doctrine of stare decisis is one of the bedrock principles on which this court is built. It is an important restraint on judicial authority and provides needed *40 stability in and respect for the law. The majority acknowledges the importance of this principle but fails to follow the standards we have developed to ensure its protection. While we would abdicate our role as a court of last resort if we failed to occasionally reexamine our pri- or decisions, we must undertake this weighty task only for the most cogent reasons and with the greatest caution.
Kiesau v. Bantz, 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting). A commentator recently recapitulated the values fostered by stare decisis:
First, as in other contexts, stare decisis fosters Rule of Law values. These include consistency and equal treatment, stability, and predictability at any one time and over time. Following precedent, moreover, saves lawyers and judges from having to rethink every legal question from the ground up whenever a question arises. And precedent affords lawyers and lower court judges common points of reference from which to engage productively.
Second, in the present context, stare decisis fosters constitutionalism. It constrains the exercise of arbitrary power by the Court. It denies the Court freedom to pick and choose the precedents it will follow. It also tends to bring unity to the Constitution as it is practiced over time, and the Court’s composition changes.
Third, stare decisis fosters legitimacy, which requires the Court to have, and be perceived as having, adequate legal justifications for its decisions. Justifications flowing from the Court’s precedents tend, at the least, to be so perceived. Even when the Justices disagree, the disagreement will be perceived to be one about the law when all of them reason from the same starting points. To the extent possible, the Constitution and precedents interpreting it should form a coherent corpus of law, widely perceived and practiced as such.
[[Image here]]
Both stare decisis and overruling are constitutionally vital. For the reasons to be given below, the Constitution requires the Court to practice stare deci-sis. It is necessary to the Court’s unifying mission, and it is a stabilizing force in a constitutional system under the Rule of Law. In addition, the Rule of Law entails the Court’s duty to follow its constitutional precedents: The Court has a duty to follow the law; such precedents are parts of the law; therefore, the Court has a duty to follow such precedents.
At the same time, the Court’s power to overrule is vital for maintaining constitutionalism by correcting mistakes and updating the law. Overruling, moreover, is the only effective check on the Court’s exercise of its power to interpret the Constitution. The Court’s power to overrule also is essential to the constitutional system’s continuing legitimacy.
Steven J. Burton, The Conflict Between Stare Decisis and Overruling in Constitutional Adjudication, 35 Cardozo L. Rev. 1687, 1696-97 (2014) (footnotes omitted). Professor Burton also aptly observed, “A Supreme Court not bound by its precedents likely would vacillate over time as its composition changes, yielding unacceptable discontinuity and instability, and deflating the Court’s legitimacy.” Id. at 1710.
I agree with the majority that we should reexamine our search and seizure precedent in light of changes in Fourth Amendment jurisprudence and that Gant narrowed Belton. See Arizona v. Gant, 556 U.S. 332, 345-47, 129 S.Ct. 1710, 1720-21, 173 L.Ed.2d 485, 496-99 (2009); New York *41 v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768, 775 (1981). It therefore makes sense to reexamine our Iowa precedent, which adopted the Belton rule in 1981. State v. Sanders, 312 N.W.2d 534 (Iowa 1981). But, today’s departure from Gant is unnecessary and ill-advised. For the reasons developed in Justice Zager’s dissent, I too would follow Gant under article I, section 8 of the Iowa Constitution.
The special concurrence today throws stones from a glass house by accusing the dissenters of infidelity to stare decisis. See State v. Young, 863 N.W.2d 249, 277, 281 (Iowa 2015). Young, decided this term, overruled State v. Allen, 690 N.W.2d 684 (Iowa 2005), a unanimous 2005 decision of our court. Young, 863 N.W.2d at 281. Our approach as dissenters consistently honors the half century of precedent of our court following decisions of the United States Supreme Court interpreting identical search and seizure provisions, instead of accepting several recent departures from that body of law beginning with State v. Ochoa, 792 N.W.2d 260 (Iowa 2010). See State v. Baldon, 829 N.W.2d 785, 837-43 (2013) (Mansfield, J., dissenting) (explaining the dissenters’ disagreement with Ochoa ).[17] The majority opinion’s reasoning also casts doubt on the continued validity of the automobile exception under the Iowa Constitution, which further undermines the goals served by stare decisis. The majority fails to reach the automobile exception, based on its myopic assertion that only the search-incident-to-arrest exception is in play in this appeal. I would not shrink from reaching the automobile exception in this appeal. As both parties recognized, the automobile exception provides an alternative ground to uphold the search of Gaskins’s van.
A. Error Preservation. The majority implicitly concludes the State waived error as to the automobile exception. Yet, the majority generously concludes Gaskins preserved error for his claims under the Iowa Constitution with a cryptic citation in district court. Gaskins never argued in district court that Iowa should depart from precedent to abandon the “evidence” prong of Gant under our state constitution. Yet, the majority vacates Gaskins’s conviction based on that very argument, first made on appeal. The majority thereby reverses the district court for failing to credit an argument the defendant never made at trial. Is it fair to our trial judges and to the State to reverse suppression *42 rulings based on arguments the defendant failed to make in district court? Are we asking our trial judges to foresee changes in the law by our court when the party did not first argue for the change in district court? Are we now expecting trial judges to consider arguments that counsel, lulled by settled precedent, fails to make? Is it not reversible error for the district court to assume the role of partisan advocate? See Hyler v. Garner, 548 N.W.2d 864, 876 (Iowa 1996) (“[W]e will not speculate on the arguments [the parties] might have made and then search for legal authority and comb the record for facts to support such arguments.”); see also State v. Hicks, 791 N.W.2d 89, 97-98 (Iowa 2010) (same); In re S.P., 719 N.W.2d 535, 539-40 (Iowa 2006) (stating “the court is prohibited from assuming the role of an advocate” and calling for “what Edmund Burke described as the ‘cold neutrality of an impartial judge’” (quoting State v. Glanton, 231 N.W.2d 31, 35 (Iowa 1975))); State v. Biddle, 652 N.W.2d 191, 198 (Iowa 2002) (noting the “constitutional right to have a neutral and detached judge”);[18] Inghram v. Dairyland Mut. Ins. Co., 215 N.W.2d 239, 240 (Iowa 1974) (noting that we do not “assume a partisan role and undertake [a party’s] research and advocacy”);
The majority repeats a result-oriented approach of playing “gotcha” with the State to avoid alternative grounds to uphold a police search, while forgivingly considering a defendant’s bare mention of the Iowa Constitution in district court to be sufficient for our court to make new state constitutional law.[19] I instead favor a level *43 playing field, with the same error preservation rules applied to the State and the defense.
The State put the automobile exception in play at the suppression hearing, arguing, “Clearly we have exigent circumstances. We have got a vehicle. We are not looking at the same type of threshold as a home or something along those lines.... ” Exigent circumstances (specifically mobility) and the diminished expectation of privacy in a vehicle are rationales supporting the automobile exception, not the search-incident-to-arrest exception. Compare Gant, 556 U.S. at 338, 129 S.Ct. at 1716, 173 L.Ed.2d at 493 (“The [search-incident-to-arrest] exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations.”), with United States v. Ross, 456 U.S. 798, 805-06, 102 S.Ct. 2157, 2163, 72 L.Ed.2d 572, 582 (1982) (contrasting the search of a structure with the search of an inherently mobile vehicle). The district court’s ruling expressly relied on Ross as well as Robbins v. California, cases adjudicating the automobile exception rather than the search-incident-to-arrest exception. Robbins v. California, 453 U.S. 420, 423, 101 S.Ct. 2841, 2844, 69 L.Ed.2d 744, 749 (1981), overruled by Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572. The district court necessarily considered the automobile exception in its ruling, and for this reason alone, the automobile exception should be preserved for our review. See Lamasters v. State, 821 N.W.2d 856, 864 (Iowa 2012) (“If the court’s ruling indicates that the court considered the issue and necessarily ruled on it, even if the court’s reasoning is ‘incomplete or sparse,’ the issue has been preserved.” (quoting Meier v. Senecaut, 641 N.W.2d 532, 540 (Iowa 2002))).
Nor did the State abandon the automobile exception on appeal. To the contrary, both parties focused their appellate arguments on that exception. Gaskins’s appellate brief specifically urged our court to abandon the automobile exception under the Iowa Constitution and devoted fifteen pages to arguing the automobile exception should be found incompatible with the Iowa Constitution. Gaskins never contended the State waived error on the automobile exception. The State’s appellate brief in turn argued the search was valid under the automobile exception and urged our court to adhere to our precedent. The State’s appellate brief devoted thirty pages to arguing the automobile exception should remain good law under the Iowa Constitution. The issue is preserved for our review. See State v. Howard, 509 N.W.2d 764, 768 (Iowa 1993).[20]
*44 When my colleague sua sponte raised error preservation at oral argument, Gas-kins’s appellate counsel pushed back:
JUSTICE HECHT: Counsel, to what extent is the automobile exception even really before us? As I read the record on the motion to suppress, the only thing asserted as a justification for no warrant was the search was incident to an arrest and that appears to me to be the only exception that the district court addressed and so why do — why are we even looking beyond that in this case?
MS. LUCEY: I think if you find that it’s not a search incident to arrest, then you need to go to that next step, is there another exception that would uphold this ruling.
JUSTICE HECHT: Even if it’s not asserted by the State?
MS. LUCEY: I think in prior cases they certainly say that, yes. In State v. Vance, there is a dissent that indicated, well, why are we preserving this for postconviction relief if there is this other viable, potential exception.
Later in the argument, Gaskins’s counsel again declined my colleague’s invitation to argue the State waived the automobile exception:
To answer your question earlier about preservation, when you look at what the State argued, what the defense argued and what the Judge ultimately decided, it seems like they are talking about search incident to arrest but they use probable cause on occasion. So, [it is] sort of both decided and if there is no justification for the search incident to arrest under Gant.... None of that was introduced but a fair reading may actually show probable cause in exigent circumstances and that’s why I briefed it. Does that help?
The State’s counsel, in turn, stated unequivocally at oral argument that “[w]e are talking about the automobile exception.” We normally decide appeals based on the issues as framed by the parties. See Feld v. Borkowski, 790 N.W.2d 72, 78 (Iowa 2010) (“Our obligation on appeal is to decide the case within the framework of the issues raised by the parties. Consequently, we do no more and no less.” (Citation omitted.)). We should follow that approach today and decide whether this search was valid under the automobile exception.
Even if the majority were correct in concluding that the automobile exception was not adequately raised below, we “will uphold a ruling of the court on the admissibility of evidence on any ground appearing in the record, whether urged below or not.” State v. Parker, 747 N.W.2d 196, 208 (Iowa 2008) (quoting State v. McCowen, 297 N.W.2d 226, 227 (Iowa 1980)). While our general rule of error preservation requires that a proper ground be “urged in the district court,” there is an exception for evidentiary rulings that we have consistently applied. DeVoss v. State, 648 N.W.2d 56, 62 (Iowa 2002). A motion to suppress on constitutional grounds is a challenge to the admissibility of evidence seized from a defendant. Therefore, we may affirm the district court’s suppression ruling on any ground appearing in the record, whether urged by the parties or not. DeVoss, 648 N.W.2d at 62; see also State v. Newell, 710 N.W.2d 6, 23-24 (Iowa 2006) (indicating appellate court can affirm evidentiary ruling on any ground raised on appeal). I would affirm the suppression ruling based on the auto *45 mobile exception, which is supported by the record.
B. The Search Is Valid Under the Automobile Exception. In State v. Olsen, we unanimously adopted the federal standards for the automobile exception. 293 N.W.2d 216, 220 (Iowa 1980) (“In this case we are persuaded that the state constitution should be given the same interpretation as the Federal.”). Since then, we have consistently applied the federal interpretation of the automobile exception. See, e.g., State v. Allensworth, 748 N.W.2d 789, 792-96 (Iowa 2008) (collecting federal cases); State v. Maddox, 670 N.W.2d 168, 174 (Iowa 2003) (applying the automobile exception).[21]
The federal automobile exception, also known as the Carroll-Chambers doctrine, is clear, well-settled, and takes a broad view of the exigency created by the mobility of a vehicle. The seminal case of Carroll v. United States outlined the doctrine and its reasoning:
We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.
267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543, 551 (1925). Therefore, the Court concluded, a search would be legal if “the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband.” Id. at 156, 45 S.Ct. at 286, 69 L.Ed. at 552. In Chambers v. Maro-ney, the Court considered a case in which a car was impounded as a result of an arrest and then later searched at a police station. 399 U.S. 42, 44, 90 S.Ct. 1975, 1977, 26 L.Ed.2d 419, 424 (1970). First, the Chambers Court noted that the automobile exception was “wholly different” from the search incident to arrest. Id. at 49, 90 S.Ct. at 1980, 26 L.Ed.2d at 427. Then the Court held:
For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.
Id. at 52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428. Next, in Ross, the Court faced a new question: “[W]hether, in the course of a legitimate warrantless search of an automobile, police are entitled to open containers found within the vehicle.” 456 U.S. at *46 817, 102 S.Ct. at 2169, 72 L.Ed.2d at 589. The Court held that police with probable cause to search a vehicle may also search any container within it. Id. at 821, 102 S.Ct. at 2171, 72 L.Ed.2d at 591. The Court explained:
It is therefore significant that the practical consequences of the Carroll decision would be largely nullified if the permissible scope of a warrantless search of an automobile did not include containers and packages found inside the vehicle. Contraband goods rarely are strewn across the trunk or floor of a car; since by their very nature such goods must be withheld from public view, they rarely can be placed in an automobile unless they are enclosed within some form of container.
Id. at 820, 102 S.Ct. at 2170, 72 L.Ed.2d at 590-91. The Court further stated, “This rule applies equally to all containers, as indeed we believe it must.” Id. at 822, 102 S.Ct. at 2171, 72 L.Ed.2d at 592. Finally, in California v. Acevedo, the Court reiterated that any container in an automobile may be searched under the automobile exception if law enforcement has probable cause to search the vehicle. 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619, 684 (1991) (“We therefore interpret Carroll as providing one rule to govern all automobile searches. The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.”).
Our court has consistently applied the automobile exception:
We have repeatedly held that where there is probable cause and exigent circumstances, a warrantless search does not violate a defendant’s constitutional rights against unreasonable searches and seizures. A trailerless semi-truck, because of its inherent mobility, presents an exigent circumstance. This is the so-called “automobile exception” to the well-established legal maxim that warrantless searches are per se unreasonable. Even if police lack a valid warrant, they may search a vehicle if they have probable cause to believe a crime, or evidence thereof, may be found within it.
Maddox, 670 N.W.2d at 171 (citations omitted). It is undisputed that Gaskins’s van was mobile.[22] Accordingly, this search is valid under the automobile exception if the police had probable cause to believe the safe contained evidence.
I agree that the district court correctly found probable cause to search the safe. The majority does not contend otherwise. When Officer Tatum first pulled Gaskins over, he detected a strong odor of marijuana wafting from the van. That alone is probable cause to search the van. See State v. Watts, 801 N.W.2d 845, 854-55 (Iowa 2011) (collecting cases and stating that “notably, many other courts have found that the odor of raw or growing marijuana by itself can provide sufficient probable cause for a search”); State v. Moriarty, 566 N.W.2d 866, 869 (Iowa 1997) (holding that marijuana odor was part of the basis for probable cause); State v. Merrill, 538 N.W.2d 300, 301 (Iowa 1995) (same); State v. Eubanks, 355 N.W.2d 57, 59 (Iowa 1984) (holding marijuana odor alone supported probable cause).
Moreover, Gaskins initially lied about possessing marijuana then voluntarily turned over a partially smoked blunt. Officer Tatum testified that drug users fre *47 quently keep their drugs hidden nearby and believed, based on his training and experience, that he would find additional drugs in the vehicle. Officer Tatum also testified that drug users frequently carry weapons. Based on the strong odor of marijuana, the admitted presence of the blunt, and Gaskins’s initial dishonesty, there was probable cause to search Gas-kins’s van for additional evidence of drug-related offenses. Nor is the result any different because the contraband was found in a safe:
The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found.
Ross, 456 U.S. at 824, 102 S.Ct. at 2172, 72 L.Ed.2d at 593. Therefore, the search was proper under the automobile exception.
Gaskins’s appellate brief asks us to abandon the automobile exception as inconsistent with the Iowa Constitution. This would be a significant departure from well-established state and federal law, requiring us to overturn Olsen and its progeny, including Maddox, and to diverge from federal precedent. There is no basis for this departure in our constitutional text or history. See State v. Short, 851 N.W.2d 474, 510-12 (Iowa 2014) (Waterman, J., dissenting). Moreover, the automobile exception remains well-recognized in a majority of our sister states:
To provide greater uniformity in the assessment of individual cases and more consistency with regard to the admissibility of the fruits of vehicular searches based on probable cause, a more easily applied rule — such as that of the federal automobile exception — is called for.
This position is supported by the fact that we, in agreement with the U.S. Supreme Court, have long considered the immobilization of a motor vehicle while securing a search warrant to be an alternative to the immediate search of the vehicle because it is far from clear which course constitutes the greater intrusion.
Commonwealth v. Gary, 625 Pa. 183, 91 A.3d 102, 137 (2014); see also Acevedo, 500 U.S. at 577, 111 S.Ct. at 1990, 114 L.Ed.2d at 632 (promulgating a rule for the war-rantless search of vehicles and containers, reiterating “the virtue of providing clear and unequivocal guidelines to the law enforcement profession” (internal quotation marks omitted)). E.g., State v. Winfrey, 302 Conn. 195, 24 A.3d 1218, 1224 (2011) (allowing warrantless search of vehicle on probable cause); State v. Charpentier, 131 Idaho 649, 962 P.2d 1033, 1036 (1998) (concluding the Idaho Constitution provided no greater protection than the Fourth Amendment); People v. Smith, 95 Ill.2d 412, 69 Ill.Dec. 374, 447 N.E.2d 809, 813 (1983) (“We believe that the Supreme Court’s interpretation of the automobile exception, announced in Ross, achieves a fair balance between these competing objectives, and we see no reason at this time to adopt a different standard in applying Illinois constitutional provisions.”); Chavies v. Commonwealth, 354 S.W.3d 103, 110-12 (Ky.2011); State v. Ireland, 706 A.2d 597, 599 (Me.1998); Commonwealth v. Motta, 424 Mass. 117, 676 N.E.2d 795, 800 (1997) (“[W]e have also followed the Supreme Court in the area of the automobile exception.”); Moore v. State, 787 So.2d 1282, 1288-89 (Miss.2001); State v. Zwicke, 767 N.W.2d 869, 873 (N.D.2009) (bringing state doctrine in line with federal caselaw); State v. Brown, 301 Or. 268, 721 P.2d 1357, 1361 (1986) (“We agree with the proposition that if police have probable cause to believe that a person’s automobile, which is mobile when stopped by po *48 lice, contains contraband or crime evidence, the privacy rights of our citizens are subjected to no greater governmental intrusion if the police are authorized to conduct an immediate on-the-seene search of the vehicle than to seize the vehicle and hold it until a warrant is obtained.”); State v. Werner, 615 A.2d 1010, 1014 (R.I.1992) (“Now that the Supreme Court has dissipated the gray cloud of uncertainty that once encompassed the issue of exigency, we have decided to bring ourselves into conformity with Supreme Court precedent and the Fourth Amendment.”); State v. Anderson, 910 P.2d 1229, 1238 (Utah 1996) (“Following this court’s preference to interpret article I, section 14 [of the Utah Constitution] in accord with the Fourth Amendment, we adopt the rule articulated in Chambers and its progeny.” (Citation omitted.)); State v. Tompkins, 144 Wis.2d 116, 423 N.W.2d 823, 832 (1988) (“In that regard, art. I, sec. 11 of the Wisconsin Constitution provides no greater rights than [amend.] IV of the United States Constitution as interpreted by the United States Supreme Court.”). These decisions are persuasive and should be followed to decline Gaskins’s invitation to abandon the automobile exception under article I, section 8 of the Iowa Constitution.
C. The Search Incident to Arrest. Just one year after adopting the fed$ral standard for the automobile exception in Olsen, we did the same for the federal standard of vehicle searches incident to arrest.
We can, if we choose, impose stricter standards in applying our own constitutional provisions than the United States Supreme Court did in Belton. However, we believe Belton strikes a reasonably fair balance between the rights of the individual and those of society. We adopt it now as our rule.
Sanders, 312 N.W.2d at 539. Belton allowed the search of a passenger compartment of a vehicle incident to lawful custodial arrest. Id. We have continued to apply this rule since we adopted it. See, e.g., State v. Garcia, 461 N.W.2d 460, 463 (Iowa 1990).
As the majority notes, Chimel v. California, a case involving the warrantless search of a house after an arrest, is the leading case for the search-incident-to-arrest exception. 395 U.S. 752, 753-54, 89 S.Ct. 2034, 2035, 23 L.Ed.2d 685, 688 (1969). The Chimel Court concluded, “There is ample justification, therefore, for a search of the arrestee’s person and the area ‘within his immediate control’ — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.” Id. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. Belton applied the Chimel rule to a passenger, concluding “we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.” Belton, 453 U.S. at 460, 101 S.Ct. at 2864, 69 L.Ed.2d at 775 (footnote omitted). The Belton Court continued:
It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the ar-restee, so also will containers in it be within his reach.
Id. Most recently, in Gant, a man was arrested for driving with a suspended license, handcuffed, and placed in the back of a patrol car. 556 U.S. at 335, 129 S.Ct. at 1714, 173 L.Ed.2d at 491. The arresting officers searched the car and found drugs in a jacket in the backseat. Id. The Gant Court limited Belton:
*49 Police may search a vehicle incident to a recent occupant’s arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest.
Id. at 351, 129 S.Ct. at 1723, 173 L.Ed.2d at 501.
This appeal presents our first opportunity to apply Gant. Under Gant, the search of Gaskins’s van and the safe within it was a valid search to look for evidence of the offense of arrest. See id. The majority nevertheless reaches a different result under article 1, section 8 of the Iowa Constitution. Neither the text of that provision nor its history supports the conclusion that greater restrictions on law enforcement are required. See Short, 851 N.W.2d at 510-12 (Waterman, J., dissenting). For the reasons explained below and in Justice Zager’s dissent, I would follow Gant under article I, section 8 of the Iowa Constitution.
III. Practical Problems.
The majority’s decision will lead to practical problems and undermine public safety. Under the new rule created today, Officer Tatum could search the safe only while it was within Gaskins’s reach, i.e., while Gaskins remained in the driver’s seat. Officer Tatum could no longer search the van or safe without a warrant once he removed Gaskins from the van. Why place Iowa peace officers in the position of choosing whether to search for a weapon while it remains in the suspect’s reach, risking a deadly encounter? Why not continue using existing precedent, allowing the officer to take the safer approach of locking the suspect in the squad car before searching containers in the vehicle that had been within the suspect’s reach?[23]
Moreover, why force officers to impound vehicles pending a warrant to conduct a search instead of permitting a quick search at the scene under existing precedent? Officers who forego the search may lose evidence supporting the arrest. Officers who impound the vehicle will increase the inconvenience for the driver and occupants.[24] These encounters will occur under myriad circumstances, including a lone officer who stops a van full of people in a remote area in subzero temperatures. The majority opinion does not permit the officer to confiscate a container without a warrant. So, does the officer keep everyone waiting by the side of the road pending delivery of a warrant? Does the officer instead impound the vehicle and leave the passengers stranded? Or, does the officer forego the search and potentially leave guns and drugs undetected?
The majority replaces a clear rule allowing a search of the entire passenger compartment upon the arrest of an occupant with a vague, fact-specific rule under which the admissibility into evidence depends on what was within the suspect’s *50 reach at the time of the search. We have observed that
a bright-line rule has the advantage of providing clear guidance to law enforcement personnel. Clarity as to what the law requires is generally a good thing. It is especially beneficial when the law governs interactions between the police and citizens. Law enforcement officials have to make many quick decisions as to what the law requires where the stakes are high, involving public safety on one side of the ledger and individual rights on the other.
Welch v. Iowa Dep’t of Transp., 801 N.W.2d 590, 601 (Iowa 2011). Going forward, our district courts will have to decide many more factual issues at suppression hearings to resolve what was or was not within the suspect’s reach. And, suspects could simply toss the object of the search out of reach in the back of the van or backseat of the car as the officer approaches, and thereby thwart the search.
Finally, today’s decision creates two different rules for state and federal proceedings. “We have an interest in harmonizing our constitutional decisions with those of the Supreme Court when reasonably possible.... ” Olsen, 293 N.W.2d at 219-20. As the State argued in its appellate brief:
Uniformity also fosters equality under the law, the first core value in the Iowa Judicial Branch’s Mission Statement. Unnecessary departures from federal law cause inequity and unfairness. The public is rightly confounded when prosecutions on identical facts face a different fate in Nebraska or Illinois than Iowa. Even more difficult to rationalize is the defendant arrested in Des Moines who cannot be prosecuted in the Polk County District Court, but can be prosecuted up the street in the United States District Court for the Southern District of Iowa.
(Footnote omitted.) All these problems are avoided by adhering to existing precedent.
IV. The Need for Neutral Interpretive Principles or Divergence Criteria.
Our court lacks consensus on the value of neutral interpretive criteria to guide departures from settled federal precedent construing a nearly identically worded search and seizure provision. This appeal, however, is the first time the State has weighed in specifically advocating for the adoption of such criteria. In our prior cases debating the use of such criteria, the State had been blindsided by the majority’s departure from settled federal precedent and thus had no reason to urge divergence criteria. Our court’s prior decisions lacked the benefit of advocacy by the parties on divergence criteria. The majority today simply rejects in a footnote the State’s request to adopt such criteria without confronting the extensive authorities marshaled by the State.[25]
I will strive to avoid repeating what we have said before, but need to set the stage for this discussion today. In State v. Pals, *51 I argued that our court “should not diverge from well-settled Federal Fourth Amendment precedent unless doing so is required by differences in the text, structure, or history of the Iowa provision.” 805 N.W.2d 767, 789 (Iowa 2011) (Waterman, J., dissenting) (citing State v. Schwartz, 689 N.W.2d 430, 438-45 (S.D.2004) (Konenkamp, J., concurring in result)). In Baldón, Justice Appel’s special concurrence devoted over thirty pages to trumpeting this court’s right to depart from federal precedent without endorsing any interpretive criteria to guide such departures. 829 N.W.2d at 803-35 (Appel, J., concurring). I joined Justice Mansfield’s dissent that noted the value of giving deference to federal cases. Id. at 836-46 (Mansfield, J., dissenting). The debate continued the next term. See Short, 851 N.W.2d at 481-92 (setting forth ten “principles of independent state constitutional law”). The majority specifically rejected use of divergence “criteria” as “a solution in search of a problem.” Id. at 490. Rather, the majority reiterated that it decides what federal precedent to follow based simply on its own determination of “persuasiveness.” Id. at 481; see also Ochoa, 792 N.W.2d at 267 (“The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.”).[26]
The dissenters in Short took issue with the majority’s divergence from a unanimous United States Supreme Court decision that has been followed by nearly every other state supreme court without academic criticism. See id. at 507-19 (Waterman, J., dissenting) (calling for use of criteria); id. at 519-27 (Mansfield, J., dissenting) (responding to the majority’s ten principles); id. at 527-45 (Zager, J., dissenting). In response to Short, the State in this appeal has called for the adoption of neutral criteria because “Short has left the bench and bar without guidance for litigating state-constitution claims.” The State aptly observed:
Our system of constitutional governance makes the bargain with unelected judges that they may invalidate the popular will of the people’s elected branches, so long as they remain faithful to constitutional principles and respect the distinction between jurist and legislator. One gauge of faithfulness and judicial legitimacy involves consistency] or divergence between state and federal constitutional law.
(Citations omitted.) Accordingly, the State asks our court to adopt the following “five criteria to guide state constitutional advocacy”:
1. Development of the claim in lower courts;
2. constitutional text;
*52 3. constitutional history, including reports of state constitutional debates and state precedent;
4. decisions of sister states, particularly when interpreting similar constitutional text; and
5. practical consequences, including the need for national uniformity.
The State cites an empirical study showing that Washington’s adoption of criteria improved advocacy and reduced illegitimate pleas for result-oriented departures from federal law: Richard S. Price, Arguing Gunwall: The Effect of the Criteria Test on Constitutional Rights Claims, 1 J. Law & Cts., 331, 355-58 (2013). I believe we would see the same benefits from adopting neutral divergence criteria in Iowa.
The Wyoming Supreme Court reaffirmed its use of divergence criteria last year:
Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned. The analysis required to establish greater protection under the state constitution involves a systematic review of applicable criteria, which may include the six non-exclusive neutral criteria recognized in [Saldana v. State, 846 P.2d 604, 622 (Wyo.1993) ]: 1) the textual language of the provisions; 2) differences in the texts; 3) constitutional history; 4) preexisting state law; 5) structural differences; and 6) matters of particular state or local concern.
Norgaard v. State, 339 P.3d 267, 275 (Wyo.2014) (citations omitted) (internal quotation marks omitted).
Such criteria provide guidance for the bench and bar, which is missing from the majority’s approach of simply diverging when it finds federal precedent unpersuasive. Today’s departure from Gant cannot be justified under the Norgaard criteria or the criteria proposed by the State. Neither the majority nor the special concurrences cite any textual difference,[27] relevant constitutional history, or policy concerns unique to Iowa to justify the departure under our state constitution. Indeed, there simply is no historical evidence the drafters of the Iowa Constitution intended article I, section 8 to provide greater protection than the Fourth Amendment. To the contrary, the fact the framers of the Iowa Constitution used the same search and seizure language shows they intended the same protection.[28] The special concurrence ac *53 knowledges that textual differences may justify different meanings, but refuses to acknowledge that use of identical wording suggests the same meaning was intended.
The special concurrence — based on its selective view of Iowa history — maintains that two of the framers of the 1857 Constitution “do not seem to be the kind of persons” who would favor judicial deference to United States Supreme Court interpretations of identical Iowa constitutional provisions. This argument based on character evidence would not be credited in a court of law and is unpersuasive to me. The constitutional debates actually show that because some of our framers objected to the 1850 Fugitive Slave Act, they inserted special language in the Iowa Constitution to assure the right to a jury trial for fugitive slaves. See Young, 863 N.W.2d at 278-79. They did not rely on or anticipate the possibility that our supreme court would devise its own unique interpretations of what was then common constitutional language.
To a large extent, the special concurrence repeats arguments made before, and I refer the reader to past responses to those arguments. See, e.g., Short, 851 N.W.2d at 519-27 (Mansfield, J., dissenting). Obviously, as has been noted before, there is a wide spectrum of possibilities between (a) automatically following the United States Supreme Court’s interpretations in all cases and (b) giving no deference at all to those interpretations. I stand somewhere in the middle, recognizing our independent duty and authority to interpret our own constitution (when the parties argue for such an interpretation), but also our limited wisdom and our limited capacity to improve on the wisdom of others. By contrast, I believe the views advocated by the special concurrence’s author, that United States Supreme Court interpretations of identical federal constitutional provisions are entitled to no weight and that we may devise our own rules of Iowa constitutional law even when no one in the case asks us to do so, fall far outside the mainstream of what state supreme courts are doing.[29]
I agree with this statement by the Utah Supreme Court: “Our jurisprudence does not garner precedential weight if, and only if, we adopt a standard that diverges from federal practice. Such a view contradicts our long-standing practice of looking to federal interpretation for guidance.” State v. Houston, 353 P.3d 55, 76, 2015 WL 773718, *14 n. 133 (Utah Feb. 24, 2015). Adherence to settled federal precedent provides predictability, stability, uniformity, and legitimacy. Without the use of any divergence criteria, the majority’s ad hoc approach seems result-oriented and unprincipled. “[T]he concern underlying the legitimacy controversy in both federal and state constitutional law is the same: to ensure that judgments are grounded in law rather than in the judges’ policy preferences.” G. Alan Tarr, Understanding State Constitutions 175 (1998). If identical or nearly identical provisions are interpreted the same, the public will have in *54 creased confidence that the decision is “rooted in law rather than in will.” Id. at 176. The concern of those who believe in judicial restraint is that a diverging court is applying “illegitimate judicial policy preferences.” Id. Point well taken.
It is therefore unsurprising that many state supreme courts use neutral criteria to determine whether to diverge from federal interpretations of the same or similar language. See, e.g., State v. Harmon, 353 Ark. 568, 113 S.W.3d 75, 78-79 & n. 1 (2003); Kerrigan v. Comm’r of Pub. Health, 289 Conn. 135, 957 A.2d 407, 421 (2008); Gannon v. State, 704 A.2d 272, 276 & n. 4 (Del.1998); People v. Tisler, 103 Ill.2d 226, 82 Ill.Dec. 613, 469 N.E.2d 147, 157 (1984) (requiring “substantial grounds” for departure, including text or history); People v. Nash, 418 Mich. 196, 341 N.W.2d 439, 446 (1983) (requiring a “compelling reason” to depart); State v. McMurray, 860 N.W.2d 686, 690 (Minn.2015);[30] State v. Muhammad, 145 N.J. 23, 678 A.2d 164, 173 (1996) (citing State v. Hunt, 91 N.J. 338, 450 A.2d 952, 965-66 (1982) (Handler, J., concurring)); Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887, 895 (1991); State v. Jewett, 146 Vt. 221, 500 A.2d 233, 235 (1985) (“It would be a serious mistake for this Court to use its state constitution chiefly to evade the impact of the decisions of the United States Supreme Court. Our decisions must be principled, not result-oriented.”); State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808, 813 (1986) (en banc) (noting the court uses “criteria to the end that [its] decision will be made for well founded legal reasons and not by merely substituting our notion of justice for that of duly elected legislative bodies or the United States Supreme Court.”); Norgaard, 339 P.3d at 275 (discussing criteria).
When courts like ours diverge from federal precedent without using divergence criteria, dissenting justices are quick to protest. E.g., People v. Ramey, 16 Cal.3d 263, 127 Cal.Rptr. 629, 545 P.2d 1333, 1341, 1342 (1976) (Clark, J., dissenting) (“Our deference toward the United States Supreme Court is fast becoming a shell game.... Today, because it happens to coincide with their own view, the majority resort to mere dictum in the plurality opinion....”); People v. Disbrow, 16 Cal.3d 101, 127 Cal.Rptr. 360, 545 P.2d 272, 284 (1976) (Richardson, J., dissenting) (“[0]n what basis do[es] the majority hold that the language of our state Constitution should be construed in a different manner than the substantially identical language of the Fifth Amendment privilege as construed in Harris? What circumstance peculiar to California requires that we do so? I can think of none. The majority ha[s] suggested none.”), superseded by constitutional amendment, Cal. Const. art. I, § 28, subdiv. (d), as recognized in People v. May, 44 Cal.3d 309, 243 Cal.Rptr. 369, 748 P.2d 307 (1988); State v. Hempele, 120 N.J. 182, 576 A.2d 793, 817 (1990) (Garibaldi, J., dissenting) (“[T]here are no independent state-constitutional grounds to justify our divergence from federal law in this *55 area. The textual language, phrasing, and structures of the [provisions] are virtually identical. There is no state statute on this issue and hence no legislative history that would support interpreting the provision independently of federal law. Unlike those cases in which we have departed from federal search-and-seizure jurisprudence the most analogous pre-existing state law supports uniform interpretation.” (Citations omitted.)).
Many commentators advocate that divergence criteria should be utilized when interpreting state constitutions. See, e.g., Paul G. Cassell, The Mysterious Creation of Search and Seizure Exclusionary Rules Under State Constitutions: The Utah Example, 1993 Utah L. Rev. 751, 796 (1993) (identifying four criteria and criticizing unprincipled state constitution decisions); George Deukmejian & Clifford K. Thompson Jr., All Sail and No Anchor — Judicial Review Under the California Constitution, 6 Hastings Const. L.Q. 975, 987-96 (1979) (noting commentators consider state constitution departures without criteria to be “result-oriented” and advocating for analysis based on constitutional text, history, and a need for uniformity); Paul S. Hudnut, State Constitutions and Individual Rights: The Case for Judicial Restraint, 63 Denv. U. L. Rev. 85, 103-05 (1985) (suggesting criteria are necessary for a principled body of state constitutional law, arguing courts should also consider whether the issue presented concerns national or purely local interests); Steven J. Twist & Len L. Munsil, The Double Threat of Judicial Activism: Inventing New “Rights” in State Constitutions, 21 Ariz. St. L.J. 1005, 1065 (1989) (advocating for state constitution decisions “firmly grounded in text and original meaning”); Robin B. Johansen, Note, The New Federalism: Toward A Principled Interpretation of the State Constitution, 29 Stan. L. Rev. 297, 318-19 (1977) (setting forth factors). See generally Hans Linde, First Things First: Rediscovering the States’ Bills of Rights, 9 U. Balt. L. Rev. 379, 392 (1980) (“[T]o make an independent argument under the state clause takes homework — in texts, in history, in alternative approaches to analysis. It is not enough to ask the state court to reject a Supreme Court opinion on the comparable federal clause merely because one prefers the opposite result.”); Earl M. Maltz, The Dark Side of State Court Activism, 63 Tex. L. Rev. 995 (1985) (criticizing the “noninterpretive” approach, noting approaches based on criteria are more legitimate); Robert F. Utter, The Practice of Principled Decision-Making in State Constitutionalism: Washington’s Experience, 65 Temp. L. Rev. 1153, 1157 (1992) (“Without neutral criteria to aid in developing or selecting a state constitutional standard, courts relying on the state constitution ... create the impression that reliance on the state constitution is merely result-oriented— that is, not dictated by sound reasoning.”). A recent student note aptly focused on our court’s standardless divergence from federal precedent in juvenile sentencing cases and called for our court to adopt principled interpretation standards for adjudicating state constitutional claims. Elisabeth A. Archer, Note, Establishing Principled Interpretation Standards in Iowa’s Cruel and Unusual Punishment Jurisprudence, 100 Iowa L. Rev. 323, 360 (2014).
The State’s appellate brief summarizes the lessons of these authorities as follows:
State-constitution decisions made without neutral principles or criteria risk being seen as — or actually are— result oriented. Regardless of ideological bent, result-oriented judicial outcomes should be avoided. Today’s court may favor expansive protection for crim *56 inal offenders, while tomorrow’s favors the property rights of the ultra-rich or elevates capitalist concerns above environmental interests. The “persuasiveness” approach taken by this Court in Short will allow judges to “mistake personal preferences for constitutional compulsion” and should be abandoned.
[[Image here]]
The problem is this: interpreting the state constitution without reference to federal decisions or any interpretive criteria is like playing a sport where only the referee knows the rules. The players can walk onto the field with a bat and ball, but they don’t have any idea how the equipment is to be used, which points count and which don’t, or even how to win. At the end of the game, the referee declares a winner, but the players are left unsatisfied and spectators question the game’s legitimacy. So too for this Court after Short.
Short’s “persuasiveness” rule turns constitutional law into a guessing game — and neither the State nor a defense attorney can fairly guess what will be found most “persuasive” to this Court or predict what constitutional rules will result from litigation. No doubt this will be reflected in briefing that comes before this Court, where state-constitution claims will continue to be inadequately briefed and underdeveloped.
(Footnote and citation omitted.)
I agree with the State’s criticism of Short. I also agree with the State’s criticism of the majority’s practice, repeated today, of diverging from federal precedent to decide a state constitutional question without using criteria:
Proceeding down the road of state-constitution divergence without clear criteria or guideposts will mean that all that is required for constitutional change is a change in appellate-court membership. • This is inconsistent with the American separation of law and politics, eliminates any distinction between the courts and the elected branches, and injects substantial uncertainty that undermines stare decisis. Like a boat without a rudder, the lack of clear interpretive criteria will leave this Court’s jurisprudence subject to shifting winds and changing tides, rather than providing the measured stability contemplated by our constitutional framers.
I would encourage the bench and bar to brief and argue divergence criteria to guide our state constitutional adjudication, notwithstanding the majority’s failure to acknowledge the value of doing so. None of the various divergence criteria supports the majority’s divergence from Gant today.
V. Conclusion.
For these reasons, I would affirm the district court decision.
MANSFIELD and ZAGER, JJ., join this dissent.

. The majority’s practice of finding greater rights under'article I, section 8 of the Iowa Constitution did not begin with State v. Tonn, 195 Iowa 94, 104-07, 191 N.W. 530, 535-36 (1923), abrogated on other grounds by Mapp v. Ohio, 367 U.S. 643, 654-55, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1089-90 (1961). Tonn declined to follow the federal exclusionary rule while acknowledging the warrantless search was illegal. Id. It thus provided less protection under the Iowa provision. Moreover, Tonn addressed judge-made remedies, rather than the scope of permissible warrant-less searches. The same is true of State v. Cline, 617 N.W.2d 277 (Iowa 2000), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 602 n. 2 (Iowa 2001). See Baldon, 829 N.W.2d at 838-39 (Mansfield, J., dissenting). Tonn is at best weak support for the view that our court has a history of departing from Fourth Amendment interpretations. First, the Fourth Amendment was not applied to the states until 1961, well after Tonn. See Mapp, 367 U.S. at 655-57, 81 S.Ct. at 1691-92, 6 L.Ed.2d at 1090-91. Second, our court's next departure from Fourth Amendment precedent was not until Cline, nearly eight decades after Tonn. Before and after Cline, our court repeatedly adhered to federal search and seizure precedent. See Baldon, 829 N.W.2d at 837-39 (Mansfield, J., dissenting) (collecting cases). In any event, Tonn belies the majority's view that the Iowa search and seizure provision provides greater protection than the Fourth Amendment. Perhaps for that reason, the Ochoa court did not cite Tonn to justify its departure from federal precedent in 2010.

. Given our court's long-standing practice of following Federal Fourth Amendment decisions, it was foreseeable to the parties and district court that in light of Gant, we would revisit our search-incident-to-arrest precedent that had relied on Belton. See State v. Vance, 790 N.W.2d 775, 786-89 (Iowa 2010). It is one thing to expect the bench and bar to foresee our court would apply the new United States Supreme Court decision in Gant. A greater degree of prescience is required to foresee the majority’s departure today from Gant without affirming the suppression ruling under the automobile exception. See id. at 790 (affirming the defendant’s conviction without deciding the ineffective-assistance claim and stating, "In Gant, the Supreme Court noted that even if the Belton analysis, as limited by Gant, does not uphold the constitutionality of a search, other exceptions to the warrant requirement authorizing an officer to search a vehicle might be applicable to uphold the search"); id. at 790-91 (Cady, J., dissenting) ("[T]he search [of Vance’s vehicle] was clearly permitted under the well-recognized automobile exception to the warrant requirement. The majority’s own opinion bears this out.”).

. For example, in Ochoa, this court concluded the State waived several grounds for upholding a warrantless search of a parolee's motel room based on consent. 792 N.W.2d at 291-92. We reversed the court of appeals decision that had relied on Fourth Amendment precedent. Id. at 292. The Ochoa court decided the case under the Iowa Constitution, even though the defendant had failed to argue the Iowa Constitution in district court or on appeal. See Baldon, 829 N.W.2d at 837 & n. 46 (Mansfield, J., dissenting) (discussing Ochoa).
Similarly, in State v. Pals, our court considered the constitutionality of a consent search following a traffic stop. 805 N.W.2d 767, 770-71 (Iowa 2011). The district court and court of appeals upheld the search under Fourth Amendment precedent. See id. at 771. The defendant made no argument for broader protection under the Iowa Constitution in district court or on appeal. Id. at 784-85 (Waterman, J., dissenting). Nevertheless, the Pals majority reversed on state constitutional grounds it raised sua sponte. Id. at 779-84. In Baldon, our court invalidated a search of a parolee on a state constitutional ground never briefed by defendant. 829 N.W.2d at 837 n. 46 (Mansfield, J., dissenting). Yet, the majority refused to consider the State's alternative argument to uphold the search under the special-needs doctrine. Id. at 789 (majority opinion). In State v. Short, the majority held the State waived an alternative ground to support the search of a probationer’s home (a consent-to-search provision in the probation *43 agreement) even though the district court specifically found "the police had the right to search Short’s residence under the terms of his probation.” 851 N.W.2d 474, 479 (Iowa 2014) (internal quotation marks omitted). Yet, the majority departed from federal precedent to invalidate the search, even though the defendant never argued in district court that the Iowa Constitution provided greater restrictions on police searches than the Fourth Amendment. See id. at 509 & n. 12 (Waterman, J., dissenting) (protesting the majority’s inconsistent approach to error preservation). In each of these cases, the majority took a hypertechnical approach to error preservation against the State to avoid alternative grounds to uphold a search, and blindsided the State by departing from federal precedent in a manner the defendant never argued in district court.

. The State argued that Gaskins waived error by failing to assert in district court that the automobile exception should be abandoned. The State observes that if Gaskins had done so, it could have developed the record at the suppression hearing on that issue. A remand would allow the district court to decide the Iowa constitutional claims based on a more fully developed record. Cf. State v. Hoeck, 843 N.W.2d 67, 72 (Iowa 2014). But, in my opinion, the record is adequately developed to uphold the search *44 under the automobile exception as well as under the Gant search-incident-to-arrest exception.

. The separate special concurrence of Chief Justice Cady predicts that EDMS technology will eliminate the need for the automobile exception because officers can obtain warrants electronically from the field. This is not the time to address the impact of EDMS. EDMS was not available statewide at the time of the incident, and Officer Tatum did not have EDMS in his squad car for the search at issue today. Accordingly, neither party briefed the impact of EDMS, and no factual record was made regarding use of EDMS. See State v. Ritz, 270 Or.App. 88, 347 P.3d 1052, 1054, 1060 (2015) (affirming DUI conviction and warrantless entry to home to apprehend suspect for time-sensitive blood alcohol test, relying on evidence it would have taken officer ninety minutes to obtain warrant using “in-car computer” (internal quotation marks omitted)).

. Gaskins was lawfully stopped by the police while driving his van on a public highway. He does not claim he was living in his van. Accordingly, there is no basis for extending the heightened privacy rights for a home to this case. Gaskins’s van is not his castle.

. The special concurrence refers to several concurring opinions suggesting the concern for officer safety no longer justifies a warrant-less search once a suspect is handcuffed. Just this month, however, a police officer in New Orleans, Daryl Halloway, was reportedly shot dead by a handcuffed arrestee. Suspect sought in kilting of New Orleans police officer, USA Today, June 20, 2015, available at: http://www.usatoday.com/story/news/nation/ 2015/06/20/suspect-sought-slaying-new-orleans-police-officer/29036471/.

. The special concurrence argues inconvenience to law enforcement does not justify departures from the warrant requirement, but fails to address the inconvenience to motorists and their passengers that will result from today’s decision.

. The special concurrence accuses the dissenters in this case of being engaged in "perpetual dissent” because Ochoa, Pals, Baldon, and Short previously rejected the adoption of neutral criteria for deviating from federal interpretation of the Fourth Amendment. This accusation disregards a couple of points.
First, is a "perpetuity” four days? On June 26, 2015, we concurred in the court’s opinion in State v. King, 867 N.W.2d 106, 2015 WL 3930051 (Iowa 2015), notwithstanding the court’s extensive reliance on Ochoa, Baldón, and Short.
Second, the court has never before confronted a party's request (in this case, the State of Iowa) to adopt specific neutral criteria — and still has not confronted that argument today. The lengthy rejection of neutral criteria comes today in a special concurrence, not in the opinion of the court.

. I do not share the majority's self-confidence. I see a difference, for example, between the four-three decision of our court in Short finding broader rights for a probationer under the Iowa Constitution, decided without the benefit of adversarial briefing on that issue, and the unanimous decision of the United States Supreme Court in United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), which the Short majority, nearly alone among the fifty states, declined to follow. Only one other state supreme court has declined to follow Knights on state constitutional grounds. York v. Wahkiakum Sch. Dist. No. 200, 163 Wash.2d 297, 178 P.3d 995 (2008) (en banc). Before the United States Supreme Court weighs in, Fourth Amendment issues are typically thoroughly vetted in the lower courts and comprehensively briefed by the best legal minds in the nation. We may disagree with the outcome and reach a different result under article I, section 8 of the Iowa Constitution, but should do so only for good reasons that are lacking in this case. The reader can decide whether Knights or Short should enjoy greater respect and legitimacy.

. The difference between a semicolon and a comma is inconsequential. See Short, 851 N.W.2d at 522 (Mansfield, J., dissenting). As the State noted:
One expects that, if the semicolon in Article I, section 8 fundamentally altered the meaning of that provision, this argument would have emerged at some point within the first 150 years this Court interpreted the Iowa Constitution — not for the first time in 2010.
Neither the wide-ranging special concurrence nor the majority today mentions the semicolon argument as a reason to find broader search and seizure restrictions on law enforcement under the Iowa Constitution. The majority previously relied on that argument. See Short, 851 N.W.2d at 501; Ochoa, 792 N.W.2d at 268-69.

. The special concurrence cites our court’s storied decision, In re Ralph, 1 Morris 1 (Iowa 1839). See also Short, 851 N.W.2d at 483-84 (citing In re Ralph). Justice Mansfield's dissent in Short put In re Ralph in proper legal and historical context. Short, 851 N.W.2d at 523-24 (Mansfield, J., dissenting). In re Ralph is not an example of our court choosing to diverge from a United States Supreme Court decision interpreting an identically worded provision found in both the Federal and Iowa Constitutions. In re Ralph preceded Dred Scott and the adoption of our state constitution and was based on an *53 interpretation of federal law. See Short, 851 N.W.2d at 523-24 (Mansfield, J., dissenting).

. In my view, it is the majority's combination of (1) failing to give any deference to established Fourth Amendment interpretations while (2) devising its own interpretations without a proper adversarial process that has been so harmful to jurisprudence. While there are examples of other state supreme courts not following federal constitutional precedent, I am unaware of any other state supreme court that has been so willing to do so sua sponte. Cf. State v. Tiedemann, 162 P.3d 1106, 1115 (Utah 2007) (noting that "Tiedemann clearly raised the state constitutional question and submitted arguments, albeit ones the trial court found unpersuasive, below").

. The special concurrence cites several Minnesota Supreme Court search and seizure decisions departing from federal precedent. The cited decisions predated that court’s use of a nonexclusive list of factors for departing from federal precedent beginning in Kahn v. Griffin, 701 N.W.2d 815, 829 (Minn.2005). In McMurray, the Minnesota Supreme Court noted it may decline to follow a decision of the United States Supreme Court that (1) makes a “radical departure” from precedent with no persuasive explanation, (2) has "retrenched on a Bill of Rights issue,” or (3) fails to adequately protect our citizens’ basic rights and liberties.” 860 N.W.2d at 690. None of those reasons for diverging apply to Gant, which, as noted above, narrowed Belton and thereby provides motorists with greater protection against warrantless vehicle searches.