*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

　　　　　Plaintiff-Appellee,

v

ANTHONY FRANCIS IANNOTTI,

　　　　　Defendant-Appellant.

UNPUBLISHED
January 16, 2020

Nos. 341477; 341493; 341494; 341503
Macomb Circuit Court
LC Nos. 2017-000119-FC;
　　　　 2017-000118-FH;
　　　　 2016-004243-FH;
　　　　 2016-002836-FH

Before:  K. F. KELLY, P.J., and BORRELLO and SERVITTO, JJ.

PER CURIAM.

Defendant Anthony Francis Iannotti appeals as of right his jury trial convictions of first-degree home invasion, MCL 750.110(a)(2), breaking and entering a building with intent, MCL 750.110, and possession of burglar tools, MCL 750.116 (lower court file no. 2016-004243-FH); assault by strangulation, MCL 750.841b (file no. 2016-002836-FH); third-degree home invasion, MCL 750.110(a)(4); tampering with electronic monitoring device, MCL 771.3f (file no. 2017-000118-FH); second-degree murder, MCL 750.317; first-degree felony-murder, MCL 750.316, unlawful driving away a motor vehicle, MCL 750.413, and larceny in a building, MCL 750.360 (file no. 2017-000119-FC).[1]  Finding no errors providing relief, we affirm defendant's

---

[1] He was sentenced as a habitual offender, fourth offense, MCL 769.12, to the following terms of imprisonment:  20 to 50 years for the first-degree home invasion conviction, 12 to 50 years for the breaking and entering a building and possession of burglar's tools convictions; 25 to 50 years for the assault by strangulation conviction; 6 to 50 years for the third-degree home invasion conviction, 3 to 15 years for the tampering with electronic monitoring device conviction; 40 to 70 years for the second-degree murder conviction, life imprisonment for the first-degree felony-murder conviction, 12 to 50 years for the unlawful driving away a motor vehicle conviction, and

convictions and sentences, but remand for the ministerial purpose of correction of the award of attorney fees.

## I. BASIC FACTS

On June 30, 2016, Cassandra Iannotti, defendant's wife, worked the evening shift at a Meijer store, and then socialized with co-workers in the parking lot. She returned home after 4:00 a.m. At the time, defendant was home with his relative, Alec Iannotti, and Alec's girlfriend, Samantha Somers. The couple went outside to smoke while defendant followed Cassandra into the kitchen. Defendant was prone to jealousy and would display "fits of rage." He grabbed Cassandra by the neck and choked her until she passed out. Approximately two hours later, Cassandra called the police, defendant was arrested, and her neck injuries were photographed.

Defendant grew close to Cassandra's mother. Cassandra was present when defendant called her mother, Susan Carrier, and defendant asked to speak with her. Defendant admitted to the strangulation and apologized. He also spoke about the incident on social media. Defendant was granted bond in the strangulation case, but he had to wear a GPS tether and could not return to the couple's home because of a no-contact provision. Additionally, Cassandra obtained a PPO against defendant on July 21, 2016, citing his attempt to kill her by strangulation.

With the aid of family, defendant was able to post bond. On August 10, 2016, Cassandra arrived home at approximately 4:30 a.m. when she heard a cracking noise. She believed that defendant was still in jail. She found that "the back door was shattered and the blinds were messed up." Someone had thrown a brick at the door. Cassandra called the police and waited outside for them to arrive. When she re-entered the home, the space to the attic was open; Cassandra knew that defendant kept money in the attic. After this break-in, Cassandra went to stay at Carrier's home, but her father arranged for Cassandra to stay in a hotel with her children.

Also on August 10, 2016, Mila Leggett and her husband, Kenneth Williams, lived in an apartment. Leggett worked the 11:00 p.m. to 7:00 a.m. work shift. Every day after returning home from work, the couple sat out on the porch and drank coffee together. On that day at approximately 8:00 a.m., Leggett identified defendant walking from the parking lot to the apartment occupied by Dona Lawrence, the victim.[2] Williams described defendant as sweaty

---

3 to 15 years for the larceny in a building conviction. The trial court later vacated the second-degree murder conviction because the sole victim was Dona Lawrence.

[2] Cassandra testified that defendant was raised with and extremely close to his cousin, Jennifer Shoemaker, but she died in April 2016, from a combination of the wrong medications. Shoemaker had received medications from the victim. Consequently, defendant blamed the victim as well as Shoemaker's children, Alec Iannotti and Carley Shoemaker for her death. Lawrence lived one-mile from Cassandra. Upon learning of Lawrence's death, Cassandra telephoned the police to notify them of defendant's release from jail, illegal entry into Cassandra's home, and that defendant may have visited the victim.

with facial hair and wearing a red shirt and khaki shorts. Defendant knocked on the victim's door and the patio door without getting a response. Finally, he knocked on the bedroom window. Williams recalled defendant calling out the victim's name and saying, "this is Anthony, I'm sorry to wake you up." The victim apparently woke up and let defendant into her apartment. Later that morning, the victim's brother-in-law, Don Rassegga, knocked on the couple's door and said that the victim was on the floor deceased.

Rassegga was close to the victim and visited her nearly every day. He would go to her home, make coffee, open the door wall so the cats could look outside, and smoke cigarettes. On August 10, 2016, he went to the victim's apartment and continued that routine, but the victim was still asleep. He left after approximately one hour, but only secured one of two locks on the door. When Rassegga returned to the apartment parking lot, he saw the victim's vehicle backing out. He passed the vehicle and observed a white male in his mid-30s with dark facial hair driving the victim's car. Rassegga thought the victim had allowed a friend to drive it or that the vehicle was going to be repaired. The driver (defendant) looked at Rassegga and smiled.[3] Rassegga did not see Alec Iannotti or Somers in the area. Although Rassegga only secured one door lock when he left the apartment earlier, he returned to find both door locks secured. Once inside, he found the victim deceased. It was now after 9:00 a.m.

On August 16, 2016, Julie Hyland was getting ready to take her cat to the veterinarian with her son. Her property also had a barn,[4] and there was an enclosed porch with screens attached to her home. Although there was no door access to the porch, it could be accessed through two windows. She was at the window near the kitchen sink when she saw the back of a man's bald head. The man was wearing a tan jacket and left the porch. Hyland called 911. Police responded to Hyland's 911 call and set up a perimeter. Defendant was arrested at a nearby apartment complex.

Defendant testified at trial and a 20-page document that he drafted was admitted into evidence. In the letter, defendant acknowledged that, after being released from jail, he violated the no-contact order and PPO and went into the marital home to take money and items. He cut off his tether and proceeded to the victim's home. However, he denied committing the murder. Instead, he claimed Alec Iannotti began to beat the victim and Somers held a gun on defendant and ordered him to help.[5] Defendant asserted that they insisted defendant touch the victim. The couple also ordered defendant to take the victim's vehicle. Defendant admitted to being on the run and entering the Hyland home in search of food. Despite the denial of the commission of the murder, defendant was convicted as charged.

---

[3] At trial, it was disclosed that defendant's DNA was found on the gear shift of the victim's vehicle. The victim's vehicle was located in a parking lot near a store where he purchased a cellular telephone.

[4] Her husband and the police found evidence that defendant was living in the barn.

[5] Somers testified in rebuttal and denied that the couple was present or that they had any involvement in the murder.

## II.  APPELLATE BRIEF

## A.  EFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that trial counsel was ineffective for failing to seek severance of the cases to prevent the domestic assault evidence from being admitted in the unrelated murder case, for failing to advise defendant to plead guilty to the domestic assault cases to prevent their admission in the murder trial, and for failing to call witnesses.  We disagree.

"Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law."  *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).  This Court reviews a trial court's factual findings for clear error and its conclusions of law de novo.  *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019).  When no *Ginther*[6] hearing is held in the trial court, appellate review is limited to mistakes apparent on the record.  *Id.*

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions."  *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d 173 (2016).  To obtain a new trial premised on ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different.  *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012).  It is presumed that defense counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial strategy.  *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).  "[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight."  *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013).  "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."  *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).  "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel."  *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).  However, counsel may be found ineffective for the strategy employed when it is not a sound or reasonable strategy.  *People v Dalesandro*, 165 Mich App 569, 577-578; 419 NW2d 609 (1988).  The burden of establishing the factual predicate for a claim of ineffective assistance is on the defendant.  *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

## 1. SEVER TRIALS

MCR 6.120 addresses joinder or severance of charges against a single defendant and provides:

---

[6] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

(A) Charging Joinder. The prosecuting attorney may file an information or indictment that charges a single defendant with any two or more offenses. Each offense must be stated in a separate count. Two or more informations or indictments against a single defendant may be consolidated for a single trial.

(B) Postcharging Permissive Joinder or Severance. On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant, or sever offenses charged in a single information or indictment against a single defendant, when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.

(1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

(3) If the court acts on its own initiative, it must provide the parties an opportunity to be heard.

(C) Right of Severance; Unrelated Offenses. On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1).

To determine whether joinder is appropriate, a trial court must first determine the relevant facts and assess whether the facts constitute relevant offenses that would make joinder appropriate. *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). The plain language of MCR 6.120 permits joinder for "related" offenses, and offenses are related if they consist of "the same conduct" or "a series of connected acts or acts constituting part of a single scheme or plan." When there is a logical relationship between joined counts as well as overlapping proofs, joinder is appropriate. *Id*. at 237. Thus, the admissibility of evidence in other trials is also considered when determining if joinder is appropriate because the joinder of other crimes cannot prejudice defendant. *Id*. There is no temporal requirement found in MCR 6.120, and the acts need not be committed at the same time, but nevertheless must be connected acts or acts constituting a single scheme or plan. *Id*. at 241. Any error in the joinder of cases is not grounds for disturbing the judgment unless refusal to take such action appears to be inconsistent with substantial justice. *Id*. at 243.

In the present case, there was no motion to sever the charges. Thus, the trial court did not conduct an analysis of the propriety of the joinder of all charges in one jury trial. Nonetheless, we conclude that the trial court did not err in joining the charges in one trial. Although the charges consisted of assault, home invasion, and murder, and were committed two months apart, they were seemingly connected. Defendant committed an act of domestic violence upon wife Cassandra when he assaulted her in their home. He was arrested and jailed until he was able to post bond. After he posted bond, he returned to the marital home despite the order of no-contact in the criminal case and Cassandra's PPO against defendant. There, he broke into the home and took items, including cash. Then, defendant apparently went to the home of the victim, and in an apparent rage, he murdered the victim by stabbing her over 100 times. There was evidence that defendant showered, went through the victim's purse, and stole her car. From there, defendant went and purchased a cell phone and eventually hid out at the Hyland barn and property. Although the Hyland property gave defendant shelter, he entered the home searching for food and, one could infer, other items of value or cash to continue his evasion of authorities.

The fact that defendant's crimes took place across two months[7] does not alter the conclusion that joinder was appropriate. In *Williams*, the police raided a hotel room in November 4, 2004. Upon entry, they found the defendant coming out of the bathroom as it flushed, but were able to retrieve a bag of cocaine stuck in the drain and rocks of cocaine when the toilet bowl was broken. In February 2005, the police executed a raid at a home where the defendant was found seated on a couch with a bag of cocaine near him and a package of baggies and scissors in his lap. The *Williams* Court held that the joinder of the charges, despite the discrete moments in time, was appropriate because the evidence supported that the defendant engaged in ongoing acts as part of his scheme or plan to package cocaine for distribution. *Id*. at 234-235.

In light of the *Williams* decision, the trial court did not err in failing to sever the charges. Defendant strangled his wife and was jailed. Although he was jailed for a time, upon his release, he broke into the marital home and took cash and other items. He then went to the victim's home, and the circumstantial evidence and identifications indicate that he murdered the victim. He then tried to evade the police for six days before entering the Hyland home and was arrested after the homeowner saw him and phoned police. Thus, defendant's conduct, although separated in time by his jailing, consisted of connected acts, a crime spree. He apparently was prone to fits of rage and anger that caused him to assault women, and to avoid the repercussions and punishment, he stole cash and items to avoid authorities.

## 2. GUILTY PLEA

Although defendant contends that counsel should have advised him to plead guilty to keep the other acts evidence from being admitted in the murder trial, he completely fails to cite any authority addressing the admission of other acts evidence, but simply concludes that trial

---

[7] Defendant was in jail for the intermediate time period when crimes were not committed.

counsel was ineffective. Consequently, this argument was abandoned. *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001).

However, a review of the record reveals that defense counsel purposefully tried the cases together as a matter of trial strategy. Specifically, in closing argument to the jury, defense counsel acknowledged that defendant admitted to several crimes because he was being honest. Counsel indicated that defendant took the stand to accept responsibility for his actions and explain his presence at the murder scene and his acquisition of the victim's car. However, defendant adamantly denied that he committed the murder. Therefore, counsel's trial strategy was to convince the jury that defendant was only guilty of the assaultive and home invasion offenses to which he accepted responsibility, but not guilty of the most serious offense of first-degree felony-murder, a crime for which the sentence was life imprisonment.

"[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *Dunigan*, 299 Mich App at 589-590. "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *Stewart (On Remand)*, 219 Mich App at 42. Because defendant had admitted to the assault upon Cassandra, breaking into their home upon release from jail, removing his tether, and entering the Hyland home in letters, phone conversations, and social media, it was logical trial strategy for counsel to try those cases with the murder and contend that defendant admitted when he was at fault, but was honest about his lack of or forced participation in the murder. In light of the record, defendant's claim of error is without merit.

### 3. FAILURE TO CALL WITNESSES

Although defendant asserts that trial counsel was ineffective for failing to call witnesses, he failed to meet his factual predicate of supporting this claim of error. Specifically, defendant proffered that he spent time with "Tim" before the time of the murder, and therefore, it was impossible for him to commit it. Further, he argued that his unnamed physical therapist would verify that he walked with a significant limp, a condition that was not attested to by the victim's neighbors. Finally, defendant alleged that defense counsel improperly failed to call Alec Iannotti to testify because he would have confirmed that he was left-handed, suffered from addiction problems, and may have given conflicting testimony regarding his involvement in the case.

However, defendant failed to present affidavits from those individuals to demonstrate that they would have testified consistent with defendant's representation and provided a defense. In the absence of affidavits or other documentary evidence, there is no indication that those witnesses would have provided pertinent or exculpatory evidence. However, without Alec's testimony, defendant was able to testify that any involvement in the victim's murder was under duress and police simply failed to apprehend the true killer; a theory that the jury did not accept. Again, defendant failed to support the factual predicate for his claimed denial of a substantial defense. *Hoag*, 460 Mich at 6. Accordingly, the trial court correctly concluded that defense counsel was not ineffective for failing to call these witnesses.

### B. ATTORNEY-CLIENT PRIVILEGE

Defendant next submits that the trial court improperly admitted a 20-page letter[8] that was prepared by defendant for his counsel, and therefore, subject to attorney-client privilege. We disagree.

"[W]e review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principle outcomes." *People v Courser*, 326 Mich App 298, 305; 926 NW2d 299 (2018). Whether the attorney-client privilege applies to a communication presents a question of law reviewed de novo. *Nash v City of Grand Haven*, 321 Mich App 587, 592; 909 NW2d 862 (2017).

We conclude that the trial court did not abuse its discretion by admitting this evidence and holding that it was not subject to the attorney-client privilege. The attorney-client privilege is designed to foster open communications between attorney and client. *People v Nash*, 418 Mich 196, 219; 341 NW2d 439 (1983). "The privilege is personal to the client and cannot be waived by the attorney without the client's permission." *Id*. However, the privilege is an exception to the general duty to disclose, presents an obstacle to the investigation of the truth, and must be carefully circumscribed. *Id*. A balance must occur between the attorney-client privilege and the public interest in criminal investigation. *Id*. at 220. An attorney cannot be used as a depository for criminal evidence. *Id*.

The attorney-client privilege attaches to a communication that is made by a defendant to an attorney acting as a legal adviser when made for the purpose of obtaining legal advice. *Grand Haven*, 321 Mich App at 593. Thus, the privilege allows a defendant to confide in his attorney with the knowledge that his communication is safe from disclosure. *Id*.

Although defense counsel asserted that he requested his client make a record of events for his legal defense, the trial court found that defendant's recorded phone conversation caused a search warrant to issue of defendant's cell and the recovery of the unaddressed 20-page letter. The trial court's opinion concluded that the letter was not confiscated in violation of search and seizure law because the impetus for the search warrant was the review of a recorded phone conversation placed by defendant to his mother-in-law Carrier. Defendant does not protest this conclusion on appeal, only the application of attorney-client privilege. The trial court's opinion and order held in relevant part:

> In the case at bar, Iannotti asserts that the letter was prepared at his attorney's request and was never meant for public or third-party viewing. Contrary to this assertion, the prosecution provides evidence that the letter at issue was not written as a communication to Iannotti's attorney but rather was prepared as an explanation of events for Iannotti's wife and mother in law. Iannotti's

---

[8] It was also referenced as a 19-page letter, but the copy that was submitted to this Court was 20-pages in length.

telephone calls from jail are recorded, and on September 21, 2016, records reflect that Iannotti spoke to his wife, Cassandra Iannotti, and his mother in law, Susan Carrier. Here, Iannotti referred to a 20-page letter he wrote to them both, which describes what he did from the moment he was released from custody to the moment he was arrested again. He mentioned wanting to send it to Carrier, being unable to send it through the mail, but that she would get a package soon that details everything.

In the affidavit for the search warrant, the affiant, detective James Wolfe, swore that he listened to Iannotti's phone call to Carrier on September 21, 2016 and described the above conversation. Further, Wolfe listened to Iannotti instruct Carrier to get in touch with his attorney, who could pick up the package detailing everything and give it to Carrier.

The written statement at issue is 20 pages long and does not contain any reference to Iannotti's attorney, his legal proceedings, or a request for legal advice. It does not identify whether it is in fact a communication intended to be sent to another person (i.e., there is no salutation or addressee information). But when the written statement was seized, it was seized with other materials including a letter to Susan dated September 21, 2016, which begins, "I just talked to you both." In the post-script, the letter addresses "Cassie" and states a desire that the package answers her questions. An additional post-script addresses Susan, asking for her advice and instructing her to let Cassandra read "the account of what happened."

In light of the foregoing, there is no evidence that the written statement was a communication between Iannotti and his attorney. Although it contains information that could certainly be the subject of attorney-client discussions, on its face is nothing more than Iannotti's written account of the events that occurred between August 9, 2016 and his imminent arrest. Further, Iannotti's recorded telephone conversations and other letters seized pursuant to the search warrant reference the written statement with some particularity (e.g., 20 pages long, detailing everything that happened from the time Iannotti was released until he was re-arrested, etc.) and indicate that it is intended for Iannotti's wife and mother in law to read and use as they see fit. Thus, the Court concludes that the written statement at issue is not a confidential communication from Iannotti to his attorney made for the purpose of obtaining legal advice, and the attorney-client privilege does not apply.

Finally, the trial court held that the statement was not an involuntary confession because there was no evidence that defendant was subjected to police questioning.

The trial court's factual findings are reviewed for clear error, and its conclusions of law are reviewed de novo. *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014). An independent review of the letters indicates that the trial court did not clearly err in its factual findings. A recorded jail phone conversation listened to by the police led to a search warrant. The conversation indicated that defendant was sending a "package" to wife Cassandra and his

mother in law, Carrier, through his attorney that would provide an explanation of what transpired. As a result of the warrant, police obtained a letter addressed "Dear Cassandra" dated "9-15-16," a letter addressed to Carrier dated "9-21-16," and the 20-page unaddressed and undated account of defendant's activities after he was released from jail on bond. Although it was claimed that this document was subject to attorney-client privilege, there is no indication that it was intended for defendant's counsel. Further, in light of the recorded phone conversation that prompted the search warrant, the contention that it was intended for counsel is without merit. Additionally, the letter addressed to Carrier dated 9-21-16 commences with "I just talked to you both" and refers to a "package that answers your questions." Thus, contrary to defendant's assertion, the letters and 20-page document indicate that it was intended for Carrier and Cassandra. In light of a review of the documentation and the circumstances surrounding its discovery, the trial court did not abuse its discretion by admitting the evidence and holding that it was not subject to attorney-client privilege.

## C. DIRECTED VERDICT – HOME INVASION

Next, defendant contends that the trial court improperly denied his motion for directed verdict of the charge for first-degree home invasion. We disagree.

The trial court's denial of a motion for directed verdict is reviewed de novo. *Chelmicki*, 305 Mich App at 64. "If the evidence presented by the prosecution in the light most favorable to the prosecution, up to the time the motion is made, is insufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt, a directed verdict or judgment of acquittal must be entered." *People v Lemmon*, 456 Mich 625, 634; 576 NW2d 129 (1998).

To establish first-degree home invasion, the prosecutor must prove that the defendant: (1) either breaks and enters a dwelling or enters a dwelling without permission; (2) either intended to commit a felony, larceny, or assault in the dwelling or while entering, present in, or exiting the dwelling commits a felony, larceny, or assault; and (3) while entering, present, or exited is either armed with a dangerous weapon or another person is present in the home. *People v Wilder*, 485 Mich 35, 43; 780 NW2d 265 (2010). Because of the difficulty proving intent, minimal circumstantial evidence and reasonable inferences arising from the evidence is sufficient to prove the defendant's state of mind, knowledge, and intent. *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019).

We conclude that the trial court correctly denied the motion for directed verdict of the first-degree home invasion charge. A review of defendant's 20-page letter reveals that he was trying to evade the police, did not have food, and did not have resources to travel or purchase food. Therefore, in the letter, he described bathing in the river as well as entering buildings and cars to find shelter and to steal items. He described eating old honey at the Hyland barn that made him sick in addition to eating unripe vegetables from a garden he came upon. He described looking for unoccupied homes and taking items that he found there. For example, he claimed that he found an unoccupied home in Sterling Heights and slept on a futon. There, he found a t-shirt and ball cap that he stole as well as some knives. Defendant also acknowledged carrying his tools with him. He tried to steal a Jaguar near a masonry company, but it would not start. Finally, with regard to the Hyland home, he indicated that he was starving and did not believe that anyone was home because the car at the house was gone, and no one answered the

door. However, when he saw the wife near the window, he ran away. Thus, in the history delineated in the letter, although defendant did not expressly state his intention when he entered the Hyland home, there was sufficient evidence that defendant would search for resources such as food and money to continue to escape police apprehension. In light of defendant's own words, prior theft of the victim's car, and his desire to prevent apprehension by cutting off his tether and breaking into homes and businesses to sleep and steal, the trial court did not improperly deny the motion for directed verdict. The contested element of intent was established by defendant's actions and circumstances.[9]

## D. ATTORNEY FEES AND COSTS

Next, defendant alleges, and the prosecutor concedes, that the trial court ordered an excessive award of attorney fees. Specifically, although trial counsel only sought attorney fees of approximately $38,225, but at sentencing, defendant assessed $62,865 in defense costs. Although defense counsel requested $30,000 in attorney fees for the murder case, it appears that $30,000 was also awarded by the trial court for the assault by strangulation offense, a crime to which defendant admitted at trial. Accordingly, we remand for ministerial correction of the judgment of sentence on that file.

## III. STANDARD FOUR BRIEF[10]

## A. GRUESOME PHOTOGRAPHS

Defendant contends that the trial court improperly admitted gruesome photographs and video of the victim. We disagree.

The trial court's decision to admit photographic evidence is reviewed for an abuse of discretion. *People v Ho*, 231 Mich App 178, 187; 585 NW2d 357 (1998). When gruesome photographs are admitted to arouse the sympathies of the jury, error requiring reversal may occur. However, evidence that is otherwise admissible for a proper purpose is not rendered inadmissible due to the gruesome details or shocking nature of the crime. *Id*. at 188.

---

[9] In his standard four brief, defendant also asserted that the porch did not constitute a dwelling for purposes of home invasion statute. However, defendant's position was rejected in *People v Canales*, 243 Mich App 571, 576; 624 NW2d 439 (2000).

[10] Defendant raised nine issues in his standard four brief. However, issues I (attorney-client privilege), II (home invasion) and VII (ineffective assistance) were also raised in his brief on appeal and deemed to be without merit. Additionally, defendant failed to present record factual support to review his claims of failure to provide phone records in discovery (issue III) and irrelevant intimate evidence (issue VI). Finally, although he contends that the prosecutor commented on his constitutional right to remain silent (issue IV), a review of the record reveals that the prosecutor did not comment on his silence, but challenged his assertion that he acted under duress after he left the scene of the murder.

Defendant's challenge to the admission of this evidence is without merit. There are photographs of the victim lying on the floor with blood around her head. Further, there is a video recording of the crime scene that similarly depicts the victim. Although the autopsy photographs depicted the puncture wounds to the victim's now shaved head, the blood was also cleaned from the area, and the photos were not practically graphic or gruesome. Under these circumstances, the trial court did not abuse its discretion by admitting the photos.

## B. DOUBLE JEOPARDY

Defendant next asserts that he was improperly convicted of both felony-murder and the predicate felony in violation of the double jeopardy clause. However, defendant's position was overruled by the Michigan Supreme Court in *People v Ream*, 481 Mich 223; 750 NW2d 536 (2008), and therefore, is without merit.

## C. CUMULATIVE ERROR

Because defendant failed to establish errors at trial, he failed to establish the cumulative effect of errors meriting reversal. *People v Dobek*, 274 Mich App 58, 106-107; 732 NW2d 546 (2007).

We affirm defendant's convictions and sentences, but remand for ministerial correction of the award of attorney fees. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello
/s/ Deborah A. Servitto